## Greenville National Bank v. Evans-Snyder-Buel Co. *et al.*

(Filed Feb. 7, 1900.)

1. Chattel Mortgage—*Acknowledgment—Two Witnesses Necessary—Entitled to ·Filing, When.* A chattel mortgage which is not signed by two witnesses, under Section 3275, of the Statutes of Oklahoma, 1893, which provides that, "A mortgage of personal property must be signed by the mortgagor in the presence of two persons, who must sign the same as witnesses thereto, and no further proof or acknowledgment is required to admit it to be filed," is not entitled to be filed in the office of the register of deeds of any county in Oklahoma, and if a register of deeds files a chattel mortgage which has not been signed by two witnesses, such filing gives the mortgagee absolutely no rights which he would not have had without such filing.

2. Chattel Mortgage Unfiled—*Rights Under Same.* A general creditor is not estopped from attaching property covered by a chattel mortgage which has not been duly filed, even though he has actual knowledge of the existence of such mortgage.

3. Foreign Chattel Mortgage—*Comity of States—Attaching Creditor of Mortgagor—Rights of.* Chapter 51, of the Statutes of Oklahoma, 1893, providing for the filing of chattel mortgages, applies only to mortgages executed on property which is at the time situated in the Territory of Oklahoma, and has no reference whatever to a chattel mortgage executed in another state or territory at a time when ·the property covered by it is situated in such a state or territory, and subsequently brought into this Territory.

4. Same—*Superior Lien—Attachment.* A chattel mortgage duly executed and filed in conformity to the laws of another state or territory, on property which is at the time located therein, is superior to the rights of one who attaches the property in this Territory, after the property has been brought into this Territory, even though the mortgage is not filed in the office of the register of ·deeds of the county of this Territory wherein the property is situated prior to the levying of the attachment.

—23

5. SAME—*Contract Recognized and Enforced, When.* By the comity of states the courts in Oklahoma will recognize and enforce a contract which is valid in the state or territory where executed, unless it is in violation of a positive statute of this Territory or against the general policy of the laws thereof; and as there is no statute in Oklahoma for the filing of a mortgage executed in another state or territory at a time when the property covered thereby is situated in such state or territory, a mortgage executed in another state or territory on property located therein and duly filed according to the laws of such state or territory, is va'id after such property is brought into Oklahoma without being filed in the office of the register of deeds of the county into which the property is brought, and the mortgagee has the same rights under his mortgage that he would have in the state or territory where the property was originally located, unless the mortgage under the laws of the state where executed conflicts with the rights of a citizen of this Territory under some statute in force herein, in which event the laws of this Territory will prevail over those of the place where the contract or mortgage was made.

6. FOREIGN LAWS—*When not Pleaded—Presumption.* Where it is necessary to plead and prove the statutes of another state or territory in an action, if such statutes are not pleaded and proven, the court will presume the laws of such other state or territory to be the same as the laws of this Territory.

7. UNORGANIZED TERRITORY—*Effect of Laws Put in Force by Act of Congress—Judicial Notice.* Where congress puts in force a code of laws in a territory by reference to such laws, the same not be ng embraced in the act or by express provision made a part thereof, the federal and other courts of such territory, whose duty it is to administer such laws, and the courts of the state or territory from which such laws are taken, will take judicial notice, not only of the act of congress which gives life and force to them, but of the provisions of the laws themselves; and the courts of the other states and territories will take judicial notice of every fact that can be obtained from the act of congress, but will not take judicial notice of the provisions of the laws it puts in force; and in order for a party to avail himself of any right under such laws, in any other state or territory, the same must be pleaded and proven.

8. CHATTEL MORTGAGE—*Attaching Creditor—Need Not Pay Mortgage, When.* Section 3280 of the Statutes of Oklahoma, 1893, which provides, that before property covered by a chattel mortgage is at-

tached by a creditor of the mortgagor the officer shall pay off the amount of the mortgage debt, has no application to a mortgage executed in the Indian Territory on property located therein and subsequently brought into this Territory.

9. PERSONAL PROPERTY—*Transfer of—Chattel Mortgage, When.* A contract which conveys personal property to another merely for the purpose of securing the payment of a debt, is a chattel mortgage regardless of whether the grantor or the grantee holds possession of the property; and unless such contract is signed by two witnesses and duly filed in the office of the register of deeds in the county where the property at the time is situated, it is void as to attaching creditors.

10. ATTACHMENT—*Chattel Mortgage—Void as to Creditors, When.* An unfiled chattel mortgage is void as to an attaching creditor of the mortgagor, even if the mortgagee is in possession of the property, and the attaching creditor has actual notice of the existence of such mortgage.

11. SAME—*Forthcoming Bond—Estoppel.* Where personal property in the possession of a third person is attached as the property of the defendant, and such third person procures a return of the property to him, by giving to the officer a forthcoming bond for the redelivery of the property or its appraised value to the officer, such third person is afterwards, as between himself and the officer, or the plaintiff in the action, estopped from asserting paramount title in himself.

(Syllabus by the Court.)

*Error from the District Court of Canadian County; before John C. Tarsney, District Judge.*

*Dille. Blake & Blake,* and *Perkins, Gilbert & Perkins,* for plaintiff in error.

*Matlock, Cowen & Burney, Potter & Potter* and *Reed & Maurer,* for defendants in error.

Opinion of the court by

BURWELL, J.: The defendant in error, the Evans-Snyder-Buel company, prior to April 22, 1897, advanced to S. E. Sherwood $20,265, for the purpose of buying cattle. With this money Sherwood purchased 1,613 head of steers, 872 of which were 3 and 4 years old, and 741 2 years old. These cattle were purchased in Texas, and moved from there to Sherwood's pasture, in the Chickasaw Nation, Indian Territory. On April 22, 1897, Sherwood executed to the Evans-Snyder-Buel company his two promissory notes, one for $10,514, due October 15, 1897, and the other for $10,892,36, due November 15, 1897, and to secure the payment of these notes, he executed and delivered to H. M. Pollard, as trustee of the Evans-Snyder-Buel company, a chattel mortgage on all of the cattle referred to above.

On May 15, 1897, the Evans-Snyder-Buel company advanced Sherwood $745.50, with which he purchased 59 head of steers, which were placed with the other cattle, and on May 4, 1897, Sherwood executed to Evans-Snyder-Buel comapny his promissory note for $778.48, with interest thereon at 7 per cent per annum from maturity, due October 15, 1897, and also executed to H. M. Pollard, as trustee for the Evans-Snyder-Bnel company, a chattel mortgage on 1,672 head of steers, which number was made up from the 59 head purchased, and the 1,613 head included in the first mortgage. Both of these mortgages were signed and acknowledged. The first was filed for record with the clerk of the United States district court at Ardmore, I. T., on April 24, 1897, and the second on May 22, of the same year. All of these cattle were, by Sherwood, moved from the Indian Territory to the

"Looking Glass" pasture, in the Kiowa reservation, which reservation was, at that time, attached to Canadian county for judicial purposes.

The two mortgages to the Evans-Snyder-Buel company were filed in the office of the register of deeds of Canadian county, on July 31, 1897, at 9 o'clock, A. M. On June 28, 1897, S. E. Sherwood executed to the defendant in error, J. R. Stevens, an instrument which he claims transferred to him the absolute title to all of the cattle included in these two mortgages, together with other cattle. This instrument was signed by Sherwood and acknowledged before the clerk of the United States district court for the southern district of the Indian Territory, and was filed in the office of the register of deeds for Canadian county on June 30, 1897.

The defendant, S. E. Sherwood, on December 15, 1896, executed and delivered to the Greenville National Bank his promissory note for $5,359.76, due September 1, 1897, with interest from maturity at 10 per cent. per annum, and on July 19, 1897, he executed to John R. Williams, as trustee for the Greenville National bank, his chattel mortgage on the 1,672 head of steers which were included in the two mortgages to Evans-Snyder-Buel company, and also included in written instrument transferring cattle to J. R. Stevens.

The Greenville National bank then commenced suit on its note for $5,359.76 in the district court of Canadian county, on September 4, 1897, the same being past due, and caused an attachment order to be issued and levied on 795 head of the cattle, which were included in all of the above described instruments, as the property of S. E. Sherwood.

On September 17, 1897, J. R. Stevens filed a statutory forthcoming bond and obtained the possession of the cattle. The Evans-Snyder-Buel company, and J. R. Stevens each filed petitions of intervention, and each claimed a right to the cattle superior to the lien of plaintiff under the order of attachment. The defendant, S. E. Sherwood, being a non-resident of the Territory, service was made upon him by publication; but he failed to answer or appear in the action.

A trial was had by the court, which resulted in a judgment in favor of the intervenors, from which the plaintiff appealed to this court, by petition in error and case-made, and prays a reversal of the judgment of the trial court.

Under these facts, what are the rights of the Evans-Snyder-Buel company, as against the plaintiff's attachment?

The Statutes of Oklahoma, section 3270, provide that, "A mortgage of personal property is void as against creditors of the mortgagor, and subsequent purchasers and incumbrancers of the property in good faith for value, unless the original, or an authenticated copy thereof, be filed by depositing the same in the office of the register of deeds of the county where the property mortgaged, or any part thereof, is at such time situated." And section 3275 points out how a chattel mortgage of personal property must be executed before it is entitled to be filed.

Section 3275: "A mortgage of personal property must be signed by the mortgagor in the presence of two persons, who must sign the same as witnesses thereto, and no further proof or acknowledgment is required to admit it to be filed."

The mortgages of the Evans-Snyder-Buel company were not signed in the presence of two persons, who signed them as witnesses. No witness signed either of them. Therefore, it is clear that neither was entitled to be filed, and the fact that the register of deeds of Canadian county filed these mortgages gave them no force or effect that they would not have had without being filed. The filing of these instruments gave no constructive notice to any one. Our statute, which provides the manner in which a chattel mortgage must be executed, is mandatory and not directory merely; and by the decisions of many of the states a chattel mortgage which is lacking in a mandatory requirement, is void as against attaching creditors, unless the mortgagee is in the actual possession. (Cobbey on Chattel Mortgages, sec. 394; *Lovy v. Cockern,* [Ill.] 21 N. E. Rep. 201; *Wilcox v. Jackson,* [Colo.] 4 Pac. Rep. 966.) And in this last case, it is held, that it makes no difference if a third party had actual notice of the existence of the mortgage, if his claim is acquired *bona fide.* Also *Forest v. Tinkham,* 29 Ill. 141; *Porter v. Dement,* 35 Ill. 478; *Frank v. Minor,* 50 Ill. 448; *Sage v. Browning,* 51 Ill. 217.

But the question of possession by the mortgagee will be considered hereafter in connection with other questions in this case. However, we here say that the mortgages did not meet the requirements of our statute, and were therefore not entitled to record.

But it is insisted by the defendants in error, that the plaintiff in error had actual notice of the existence of the mortgages, and, therefore, it cannot complain; that the reason for a filing or recording act is to give notice

to the world of the existence of the lien, and that when one has actual notice of the existence of a chattel mortgage, he cannot complain, because he has actual knowledge of the facts, which the law presumes he knows, if the instrument is duly filed. Many of the states—in fact the most of the states—adhere to this rule, but the rule is only enforced when the mortgage is a valid mortgage between the parties thereto, or when it is such as the law will recognize, and if presented be admitted to the proper office for filing. At this time, without expressing any opinion as to whether or not these mortgages to the Evans-Snyder-Buel company are valid as between Sherwood or his grantees and the mortgagee, we hold that under section 3270 of the Statutes of Oklahoma, actual knowledge of the existence of an unrecorded chattel mortgage on certain property will not defeat an attachment levied upon the same property at the instance of a creditor with such knowledge. The statute expressly provides that a mortgage of personal property shall be void as against creditors of the mortgagor, unless the original or an authenticated copy thereof be filed by depositing the same in the office of the register of deeds of the county where the property mortgaged, or any part thereof, is at the time situated, and that such mortgage shall be void as against subsequent purchasers or incumbrances of the property in good faith for value, unless the original or an authenticated copy is so filed. Knowledge on the part of a creditor makes no difference, but a subsequent purcahser or incumbrancer must act in good faith and acquire his interest for value, or he will not be protected. Therefore the question of estoppel does not apply to the plaintiff in error by reason

of knowledge of the existence of such mortgage; and, if that were the only question involved, the plaintiff should have recovered. But the defendant raises the point that the mortgages to the Evans-Snyder-Buel company were executed in another state, and, even if they had not been filed in Canadian county, it is entitled to have them enforced in this Territory, and that the statute requiring all chattel mortgages to be field before the mortgagee will be protected against creditors of a mortgagor, has no application to a chattel mortgage executed by a mortgagor to a mortgagee, both of whom reside in another state or territory and is there executed, and the property located at the time of the execution of the mortgage at the place of residence of the mortgagor; while on the other hand the plaintiff in error contends that this Territory has the right and power to enact filing and registration laws; that all property as soon as brought into this jurisdiction is subjected to the operation of our own statutes, and that before a chattel mortgage will be recognized, it must be executed and filed in conformity to the laws of this Territroy.

This question is not a new one. The supreme court of Michigan, in the case of *Montgomery v. Wight et al.,* 8 Mich. 142, in 1860, enunciated the following rule:

"Laws for recording chattel mortgages can have no force beyond the jurisdiction of the sovereignty enacting them; and the record of a chattel mortgage in Canada, is, therefore, no notice to the creditors of the mortgagor who shall find the property in his possession in Michigan. And neither the statute of Canada nor of Michigan dispenses with the necessity of possession by the mortgagee, except where notice can be rendered effectual by recording the mortgage.

"Where, therefore, a chattel mortgage given by a resident in Canada, was properly put on record as required by the Canadian law, but the mortgagor was left in possession of the mortgaged property, and brought the same into this state, where it was taken and sold on execution against the mortgagor:    *Held*, that the title under the execution sale must prevail over that under the mortgage."

And in 1882, in the case of *Boydson v. Goodrich*, (Mich.) 12 N. W. Rep. 913, the court said: "Where chattels are mortgaged in another state and left in the mortgagor's possession, and he brings them into Michigan, the record of the mortgage in the other state it not notice to purchasers." And, "Where a valuable consideration is paid for goods, the fact that it is much below their value is not conclusive against the purchaser in good faith."

In *Corbett v. Littlefield*, (Mich.) 47 N. W. Rep. 581, the question was again considered and it was held that recording or filing in another state would not protect the mortgagee, using the following language:

"Under How. St. Mich., section 6193, providing that chattel mortgages shall be absolutely void as against creditors of the mortgagor, etc., unless filed, in case the mortgagor is a non-resident, where the property is situated, a mortgage given on property in another state, and therein filed according to the provisions of its laws, is not a lien on the property superior to that of an attachment of creditors of the mortgagor levied thereon after the property was brought into this state by the mortgagor without the knowledge or consent of the mortgagee."

These cases are in point, and decide the question squarely, but from the investigation we have been able

to make, no other state has announced the same doctrine except Vermont, in *Skiff v. Solace*, 23 Vt. 297, and *Woodward v. Gates*, 9 Vt. 358, but the Vermont court, in its later opinions, has greatly modified its former rule.

Nearly all of the courts of this country have closely adhered to the rule that if a mortgage is duley executed and filed in a state where the property is located at the time, and the mortgagor subsequently removes the property from its *situs* into another state, the courts of the latter will enforce the provisions of the mortgage as against the creditors of the mortgagor, and subsequent incumbrancers or purchasers in good faith for value, even if the mortgage has not been filed in conformity with the laws of the latter state. This rule is so thoroughly settled, a discussion on the reason for the rule may possibly subserve no good purpose, but as this is the first time that this question has been before this court, we will briefly give our reasons why the rule just stated should be followed. It has always been the policy of the courts to give force and effect to a contract made in another state, if the contract could be upheld under the law of such state; and rights once acquired in a jurisdiction under a contract will not be forfeited simply because the subject of the contract is by one of the parties moved into a foreign jurisdiction. The right remains the same, regardless of the law of the state to which the subject of the contract is removed; but the procedure of the latter state will always obtain. The general construction placed upon statutes requiring chattel mortgages to be filed, is that the law only relates to chattel mortgages made within that particular state, and has no reference to a chattel mortgage made in an-

other state or territory. Some of the states have, recognizing this rule, enacted laws requiring a mortgage of personal property, where the mortgage has been executed in another state and duly filed therein, to file a copy of his mortgage within a specified time after the property is brought into such state, and if not so filed, it is void as to creditors and purchasers and incumbrancers in good faith. These statutes have, so far as we have been able to investigate, always been upheld. But if the time for filing these foreign mortgages were so unreasonably short that the mortgagee could not protect himself under such law, I have no doubt but what a court would unhesitatingly hold it to be invalid. And where the law-making power fails to recognize or provide for the filing of a mortgage executed in another state, the rights of the mortgagee will be protected to the same extent that they would have been by the law of the place of the contract.

Chief Justice Marshall, in *Harrison v. Story*, 5 Cranch 298, said:

"The law of the place where the contract is made, is, generally speaking, the law of the contract; that is, it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself. It is extrinsic, and is rather a personal privilege dependent on the law of the place where the property lies, and where the court sits which is to decide the cause."

This language was quoted and approved in the case of *Ogden v. Saunders*, 12 Wheaton, 361, and is practically the universal rule of all the courts of the country. A chattel mortgage legally executed and filed under the laws of a state or territory is a contract between the

parties, and cannot be impaired by the laws of another state, except under some certain peculiar circumstances which take the case out of the general rule.

Mr. Justice Woodbury, in the case of *Planters Bank of Mississippi v. Thomas L. Sharpe et al.* 6 Howard 319, said:

"In considering this question, no particular liberality of construction in favor of a corporation, so as to render that an encroachment on its rights which is not clearly so, seems to be demanded of us by any more sacredness in the character of a corporation or its rights than in that of an individual; but rather, that its charter as a public grant is not to be construed beyond its natural import. The inviolability of contracts, however, and the faithful protection of vested rights, are due to the one no less than the other, and are both involved in the present inquiry, so far as affecting, by way of principal or precedent, all the various and vast interests of this kind existing over the whole Union.

"Mr. Madison denounced laws impairing the obligation of contracts as among those not only violating the constitution, but 'contrary to the first principles of the social compact, and to every principle of sound legislation.' Again, in *Paine et al. v. Baldwin et al.*, 3 Smedes & Marshal 675, one of the cases now before us, it is truly admitted that 'in a government like ours, such power is totally out of the range of legislative authority.' "

These principles are strikingly applicable to the case under consideration. If these mortgages were valid mortgages where executed and where the property was located at the time, the rights of the mortgagee are vested rights which cannot be taken away from it; and by the comity of states it should be permitted to enforce

these rights in the forum of any state where the subject of the contract may be found. It is true that a state can, in a sense, impair the obligations of contracts between its own citizens, as by a state bankruptcy law, but the rule that a state bankruptcy law will not affect a contract between the bankrupt and a citizen of another state is well established. This is upon the theory that a state cannot legislate beyond the limits of its own territory. A state may pass statutes providing a limitation in which suits may be instituted against one of its own citizens in its own forum, but who will contend that the right of a non-resident to sue in a territory should or could be denied altogether? Such a law would destroy commerce and a court would doubtless hold it to be invalid.

We have no doubt but that the legislature has the power to enact a law providing for the filing of chattel mortgages executed in another state within a reasonable time after the mortgaged property is brought into this Territory, and to provide that such mortgage shall be absolutely void as against creditors, and purchasers and incumbrancers in good faith for value, if not filed within the time fixed; but this has not been done. It has only provided for the filing of mortgages on property which is located within the Territory at the time of the execution of the mortgage. It is said that the mortgagee knew that the property was in the Territroy and therefore it should have taken and filed a mortgage in comformity with our laws. The fact that it knew that the property was moved into Oklahoma makes no difference. It has exactly the same rights it would have if the property were moved here without its knowledge or consent. Our

statute is silent on either state of facts. The mortgagee has its rights by virtue of its contract, and it is not a question of diligence in recovering the property. A mortgagee might conduct himself in such a way that he would be estopped from enforcing his mortgage as against creditors or other persons acquiring an interest in the property in good faith for value; but such questions as this we are not considering. Its failure to seize the property within a particular time would not defeat its mortgage. If the mortgages were valid in the Indian Territory where the property was located, the interest of the mortgagee followed the cattle wherever taken.

The rule we here lay down may work a hardship in some particular instances against creditors, or persons who purchased such property in good faith, or take incumbrances on the same, but the other rule would be just as harsh against the foreign mortgagee. These matters, however, cannot influence or modify a rule which is founded in reason—from which there is no escape when measured by legal principles, and which has been approved by so many of our able courts that it has virtually become the acknowledged law of the entire country. A foreign mortgage when foreclosed here must be foreclosed in conformity with our procedure for foreclosing the same, but the fact that the mortgage has not been filed, there being no express statute for the filing of a foreign mortgage, will not make it void as against an attaching creditor of the mortgagor or against subsequent purchasers and incumbrancers in good faith for value. That we should have a law providing for the filing of foreign chattel mortgages, within a limited period after the property covered thereby is brought into

this Territory, there can be no doubt; but courts construe the law as they find it, and not as it ought to be.

One of the leading cases on this subject is *Hornthall et al. v. Burwell et al.*, (N. C.) 13 S. E. Rep. 721, decided October 20, 1891.

One Moore, was owner of, and had in his possession, in Washington county, North Carolina, certain horses and other personal property which he mortgaged to the plaintiffs, Hornthall, and others, and the mortgage was duly recorded in Washington county, where the property was located, and also in Hartford county, where the mortgagor, Moore, resided. Afterwards, and while the mortgage was unsatisfied, Moore took the property across the state line into Southampton county, Virginia, where it was seized and sold on attachment by the defendants, Burwell, and others, and the proceeds applied on debts due from Moore to them. The mortgage had not been recorded in Southampton county, Virginia, in conformity with the law of that state. The plaintiffs then sued the defendants for the debt secured by the chattel mortgage, setting up all of the facts in their petition. To this the defendants demurred, presenting purely a question of law. The trial court overruled the demurrer, from which order the defendants appealed, and the supreme court affirmed the judgment of the court below, and held that even if the mortgage was not filed in Virginia, the rights of the mortgagee were superior to those of an attaching creditor in that state. Mr. Justice Shepherd, in this case, very ably reviewed the authorities at some length, and Mr. Cobbey, in his work on chattel mortgages, considered the opinion of sufficient merit to

entitle it to be quoted in full in the foot notes of his book. (Cobbey on Chattel Mortgages, vol. 2, p. 589.)

The following authorities also support the position here taken by this court: Jones on Chattel Mortgages, (3rd Ed.) sec. 301, bottom page 302; Cobbey on Chattel Mortgages, vol. 2, secs. 588-9; *Peterson v. Kaigler et al.*, (Ga.) 3 S. E. Rep. 655; *Craig v. Williams et al.*, (Virginia) 18 S. E. Rep. 999; *Wilson v. Rustad*, (N. D.) 75 N. W. Rep. 260; *Ord National Bank v. Massey*, (Kan.) 30 Pac. Rep. 124; *Handley v. Harris*, (Kan.) 29 Pac. Rep. 1145; *Keenan v. Stimson*, (Minn.) 20 N. W. Rep. 364; *Edgerly v. Rush*, 81 N. Y. 199; *Longworthy v. Little*, 12 Cushing (Mass.) 109; *Rock Island Central Bank v. Danforth*, (Mass.) 14 Gray 123; *Smith & Co. v. McLean*, 24 Io. 322; *Kanaga v. Taylor*, 7 Ohio St. 134; *Ballard v. Winter*, (Conn.) 12 Am. Law Reg. 759; *The Bank of United States v. Elizabeth Lee et al.*, 13 Peters, star page 110.

In this last case a deed of trust had been executed by Edmond J. Lee to Elizabeth Lee, in the state of Virginia, and duly recorded in that state.　Subsequently Elizabeth Lee and her husband moved to the city of Washington and took the personal property with them, where it was sought to be subjected to the payment of her husband's debts, the original title having come through him to his wife.　In this case, Catron, J., speaking for the court, said:

"It is insisted, however, that when Richard Bland Lee removed into Washington City, the statute of Maryland operated on the Virginia title of Mrs. Lee, and defeated it for the benefit of purchasers from her husband.

"The statute declares that no goods or chattels, whereof the vendor shall remain in possession, shall pass,

—24

alter, or change, or any property thereof be transferred to any purchaser, etc., unless the same be by writing, and acknowledged before one provincial justice, or one justice of the county where such seller shall reside, and be, within twenty days, recorded in the records of the same county.

"The statute has no reference to a case where the title has been vested by the laws of another state, but operates only on sales, mortgages and gifts, made in Maryland. The writing is to be recorded in the same county where the seller shall reside, when it is executed. The seller, Richard Bland Lee, residing in Virginia, it was impossible for Mrs. Lee to comply with the act. That the Virginia deed secured to Mrs. Lee the same rights here that it did in Virginia, we apprehend to be, to some extent, an adjudicated question. 　*　*

"The deed in controversy is also embraced by the fourth section of the statute of Virginia, which, amongst other things, provides for the recording of all deeds of trust and mortgages, upon acknowledgment of proof according to the directions of the act; it having been holden by the courts of Virginia, and this court, that deeds conveying chattels are included within the section referred to. And the deed vesting the property in Mrs. Lee's trustees having been duly recorded in the manner required by the statute, it was effectual according to the laws of Virginia, to protect the title against subsequent creditors of, or purchasers from, Richard Bland Lee."

The rule that the *lex loci contractus* will govern has been modified by the supreme court of the United States in the case of *Green v. Van Buskirk*, 7 Wal. 139, to the extent that where both of the contracting parties live in one state and the subject of the contract is located in another state, and the laws of the two states conflict, the law of the state where he property is situated will

prevail over the law of the state where the contract was executed. In that case, A, B and C were residents and citizens of New York. A was indebted to both B and C, and had certain chattels personal in Illinois, which he mortgage to B. Two days later, and before the mortgage could be recorded in Illinois, or the property delivered there, both record and delivery being necessary by the laws of Illinois, but not by the laws of New York, to the validity of the mortgage as against third parties, C sued A in one of the courts of Illinois, and caused the property mortgaged to B to be siezed under an order of attachment. B, although entitled to intervene in the suit in Illinois, did not do so, but permitted the property to be sold under the attachment, but after the sale of such property, brought suit in New York against C for the conversion of the chattels. C pleaded in bar the judgment in attachment recovered in the Illinois court. The supreme court of New York held that the mortgage was superior to the attachment, but the supreme court of the United States, on appeal, held "that by such judgment 'the full faith and credit' required by the federal constitution had not been given in the state of New York to the judicial proceedings of the state of Illinois; and that the judgment below was erroneous. The fiction of law that the domicile of the owner draws to it his personal estate wherever it may happen to be, yields, whenever, for the purpose of justice the actual *situs* of the property should be examined."

With the distinction as stated in the above case, and others of a similar character, the rule which we here follow is the general rule of this country, and the Evans-

Snyder-Buel company lost no rights by not having its chattel mortgages duly filed in Canadian county.

But it is insisted by the plaintiff in error that even if the mortgages, having been executed in the Indian Territory, do not have to be filed in the office of the register of deeds of Canadian county in order to protect the mortgagee against a creditor of the mortgagor, the statutes of the Indian Territory have not been pleaded by the Evans-Snyder-Buel company; and, therefore, it will be presumed that the laws of the Indian Territory are the same as our own, and that the mortgages should be measured by the laws of Oklahoma. The solution of this question depends upon whether or not the district courts of Oklahoma should take judicial notice of the laws of the Indian Territory without the same being pleaded. If they will not, and it is necessary to plead the laws in force in the Indian Territory, then if such laws are not pleaded in an action on a mortgage or contract, the laws of Oklahoma will be applied to such instrument and the rights of the parties adjudged under the provisions of the same, because in the absence of evidence to the contrary, it is always inferred that the laws of another state are the same as those of the *lex fori.*

There is, however, one feature about the laws of the Indian Territory which is somewhat different from the laws of a state, and that is this: The Indian Territory is an unorganized Territory, and all of the laws in force there are creatures of acts of congress, and the defendants in error contend that for that reason the trial court had a right to take judicial notice of the same. We have diligently searched for an authority covering this point,

but, with the exception of the two Virginia cases, have been unable to find any which discuses this question under facts and conditions similar to those presented in this action. Therefore, having but these two precedents, and neither of them discusses the question at any length, we are compelled to decide the question largely from first impression. While the state courts will not take judicial knowledge of the laws of a sister state, it has always been held that they will judicially notice the general acts of congress; and, as a rule, an act of congress which applies alike to all of the inhabitants of a state or territory is a general act, and need not be pleaded or proven. But before deciding the question as to whether or not it was necessary to plead the laws of the Indian Territory, let us consider the manner in which they were put in force by congress.

By the act of March 2, 1889, congress created the United States courts for the Indian Territory, and section 31 of that act extends over it certain general laws of the state of Arkansas. This section is in the following language: "That certain general laws of the state of Arkansas in force at the close of the session of the general assembly of that state of 1884, in the volume known as Mansfield's Digest of the Stautes of Arkansas, which are not locally inapplicable or in conflict with this act or with any law of congress, are hereby extended over and put in force in the Indian Territory until congress shall otherwise provide, that is to say, the provisions of the said general statutes of Arkansas relating to administration, chapter 1," etc. * * and then designates the particular chapters of this book, including chapter 110, on mortgages, extended over the Indian Territory.

There is nothing in this act to show what these laws are, except a reference to the general subjects and the number of the chapter in which the law under each subject may be found. A copy of these laws are not made a part of the act, which gave them force, except by reference. The laws of Arkansas referred to are not published with the act in the United States Statutes at Large, or in any other government publication, and the only way by which a court can ascertain the provisions of these chapters of Mansfield's Digest adopted by congress is by an examination of the digest itself. This being true, the question arises, did these laws of Arkansas, by reference to them, become a part of the act of congress by which they were extended over the Indian Territory? In a sense, yes, but are they a part of the act in the sense that courts are presumed to know all that is contained in them? We think not. The acts of congress are printed and bound in volumes and distributed all over the entire country in each state and territory, and it is possible for every court to become informed as to the provisions of these acts, and every court, whether federal, state or territorial, must take notice of the general acts of congress without proof. But if the act is a private act of congress, even though it is printed in the general statutes, the courts will not take judicial notice of it. It must be pleaded and proven, because the people generally are neither interested in a private act, nor presumed to know about one which in no way affects their welfare, and judicial notice is based upon the presumption that a fact is of general knowledge with persons of ordinary intelligence living in the jurisdiction of the court. We do not apprehend that Mansfield's Digest of the laws of Arkansas is of general circulation in any

state except Arkansas, or in any territory except the Indian Territory. And, as stated before, the act which gave these laws their force in the Indian Territory made no provision for their publication. Congress, instead of enacting these laws in the usual way, simply "extended" certain laws of Arkansas over the Indian Territory; and section 32, of the act, provides how certain words used in any of the laws of Arkansas shall be construed by the United States courts. For instance, this section provides that the word "county," used in the laws of Arkansas, shall be construed to mean "judicial district;" that the word "state" or "state of Arkansas," shall be construed to mean "Territory" or "Indian Territory," "but that all prosecutions therein shall run in the name of the United States." The act refers to the laws of Arkansas and "extends them over the Indian Territory." Of this fact all courts must take judicial notice, that is, all courts must take judicial notice of everything that can be gathered from reading the act alone, but they are not required to take judicial notice of the substance of the laws put in force by the act. By this we mean courts of other states and territories; but the United States courts in the Indian Territory, and the courts of Arkansas, should take judicial notice, not only of the act, but also of the laws which it put in force. Counsel for the appellees cite us to the case of *Bird v. Commonwealth*, 21 Gratt. (Va.) 800, and *Bayly v. Chubb*, 16 Gratt. (Va.) 284. These cases are before us, and we have carefully examined the language used therein and the rule they enunciate.

By acts of congress of 1801, the laws of Virginia and Maryland, respectively, were declared to be in force in the portions of the District of Columbia, deeded by these

states to the general government. The courts of Virginia judicially noticed this act. It is clear that they should take judicial notice of an act in so far as it put in force the laws of the two states, and that the Virginia courts should also judicially notice the substance of the laws put in force by the act in that portion of the District of Columbia which Virginia ceded to the United States. The act of congress continued the laws of Virginia that were then in force, and the Virginia courts are presumed to know the laws of their own state, at the time the land embraced in the District was ceded to the United States, and all that congress did was to continue these same laws. To the Virginia courts the act was plain, and judicial notice should be taken of the Virginia laws put in force in the District of Columbia the same as of the laws of their own state. But the Virginia courts went beyond this and laid down the general rule that the state courts will take judicial notice of the act of congress, and also of the laws it put in force. That court could easily familiarize itself with the Maryland laws, and for this reason it probably overlooked the fact that other courts sitting in states far away from these two states could not be expected to be familiar with their laws. Notwithstanding the high regard we entertain for the supreme court of "the Old Dominion," and the fact that these are the only cases we have been able to find which are at all similar to the one under consideration, we feel obliged to lay down a different rule from that enunciated by the Virginia courts.

The act of congress extending the laws of Arkansas over the Indian Territory is similar to the joint resolu-

tion of congress of July 7, 1898, which continued in operation the laws of Hawaii after those islands were ceded to the United States.

By this resolution it was provided that:

"The existing treaties of the Hawaiian Islands with foreign nations shall forthwith cease and determine, being replaced by such treaties as may exist, or as may be hereafter concluded, between the United States and such foreign nations. The municipal legislation of the Hawaiian Islands, not enacted for the fulfillment of the treaties so extinguished, and not inconsistent with this joint resolution, nor contrary to the constitution of the United States, nor to any existing treaty of the United States, shall remain in force until the congress of the United States shall otherwise determine.

"Until legislation shall be enacted extending the United States customs laws and regulations to the Hawaiian Islands, the existing customs relations of the Hawaiian Islands with the United States and other countries shall remain unchanged."

The federal and state courts will take judicial notice of this resolution and of its provisions, but they will not take notice of what the provisions of the laws and customs of the Hawaiian Islands are. If suit were brought in a court of this Territory on a contract entered into in the Hawaiian Islands after the passage of this resolution, surely it would not be contended that our court could take notice of the laws and customs of the Hawaiian Islands without the same being pleaded and proven. In principle there is no difference between the resolution continuing in force the laws and customs of the Hawaiian Islands and the act extending the laws of Arkansas over the Indian Territory. Courts will

only take judicial notice of facts which they are reason ably presumed to know.

We believe that the correct rule is that where congress puts in force a code of laws in a territory, by reference to such laws, the same not being embraced in the act or by express provision made a part thereof, the federal and other courts of such territory whose duty it is to administer such laws, and the courts of the state from which such laws are taken, will take judicial notice, not only of the act of congress which gives life and force to them, but of the provisions of the laws themselves; and that the courts of the other states and territories will take judicial notice of every fact that can be obtained from the act of congress, but will not judicially notice the provisions of the laws it puts in force. It therefore necessarily follows that the laws in force in the Indian Territory should not be judicially noticed, and that such laws, to avail a party of any right under them, must be pleaded and proven.

But the defendants in error say that prior to the time these mortgages were executed, congress amended Mansfield's Digest of the laws of Arkansas, put in force in the Indian Territory, and expressly provided for the filing of chattel mortgages in the district where the property is situated at the time the mortgage is executed, and the courts must take judicial notice of this act, and also insist that by this amendment congress recognized the laws of Arkansas put in force in the Indian Territory as being the same as any other general act of congress, and, therefore, the courts should take notice of the substance of the same. This latter position is untenable.

Congress will always take notice of its own acts, and will take notice of all of the provisions of a law it puts in force by reference, but the fact that congress has amended a particular section of Mansfield's Digest adds nothing to the argument. The court will take judicial notice of the amendment, and of every thing that can be gathered from it, but will go no further.

The amendment referred to is chapter 136, of the second session of the Fifty-Fourth congress (vol. 29, U. S. Statutes at Large, p. 510,) and is as follows:

"Be it Enacted by the Senate and House of Representatives of the United States of America in Congress assembled: That section 4742 of Mansfield's. Digest of the Laws of Arkansas, heretofore put in force in the Indian Territory, is hereby amended by adding to said section the following:

"*Provided*, That if the mortgagor is a non-resident of the Indian Territory the mortgage shall be recorded in the judicial district in which the property is situated at the time the mortgage is executed. All mortgages of personal property in the Indian Territory heretofore executed and recorded in the judicial district thereof in which the property was situated at the time they were executed are hereby validated."

This amendment only provides where a mortgagor is a non-resident of the Indian Territory, the mortgage shall be recorded in the judicial district in which the property is situated at the time the mortgage is executed. The mortgagor was a resident of the Indian Territory when the mortgage was made; therefore this amendment has no application to this case.

The defendants in error contend that under the statutes of Oklahoma it was absolutely necessary for the

plaintiff in error to pay off the mortgages of the Evans-Snyder-Buel company before the property embraced therein could be legally attached. The sections of the statute referred to are as follows:

"Sec. 3279. Personal property mortgaged may be taken under attachment or execution issued at the suit of a creditor of a mortgagor.

"Sec. 3280. Before the property is so taken, the officer must pay or tender to the mortgagee the amount of the mortgage debt and interest, or must deposit the amount thereof with the county treasurer, payable to the order of the mortgagee."

We had occasion to consider these same sections in the case of *Dix v. Smith*, this volume, p. 124. In that case we held that before a creditor of a mortgagor can attach property covered by a chattel mortgage which is duly executed and recorded, he must pay off the mortgage. We were then considering a mortgage duly executed on property the *situs* of which was in the Territory, and the mortgage had been filed prior to the levying of the attachment. This rule, however, does not apply where the mortgage is executed outside of the Territory, and the property is in the state or territory where the mortgage is made. The rule has just been enunciated in this opinion that the statute which provides for the filing of chattel mortgages, has reference only to chattel mortgages, executed on property located in this Territory at the time of giving the same, and has no application to mortgages executed on property located in another state or territory, and subsequently brought into this Territory. The sections of the statute just quoted above are a part of chapter 51, of the laws of

1893, which is the chapter of the statutes which provides for the filing of chattel mortgages.     Therefore, we are of the opinion that these sections in relation to the attachment of mortgaged property have no reference whatever to a chattel mortgage executed on property which is not in the Territory at the time the mortgage is executed.     It has reference only to chattel mortgages executed on property which is within the Territory when the mortgage is given.

The contention that the plaintiff in error, by taking a subsequent mortgage on the cattle attached, with full knowledge of the existence of the mortgages to the Evans-Snyder-Buel company, is estopped from claiming any rights under its attachment, is untenable.     In the case of *Dix v. Smith, supra,* it was held that a mortgagee can waive any rights he may have under a chattel mortgage, and sue on the debt and attach the property.     The rule that where a mortgagee takes a mortgage on personal property subject to all existing rights of a prior mortgagee is estopped from attacking such prior mortgage, does not apply where the junior mortgagee waives his rights under his mortgage and attaches the property. (American & English Enc. Law, vol. 11, p. 400-1.)

This disposes of the chattel mortgages of the Evans-Snyder-Buel company, as against the levy of the attachment, but it does not necessarily follow that because its rights under the mortgages are inferior to the legal rights of plaintiff in error under its attachment, that the case should be reversed as to the Evans-Snyder-Buel company.     If the instrument of writing between Sherwood and Stevens transferred the legal title to

Stevens, then the fact that the attachment is superior to the mortgages of the Evans-Snyder-Buel company, will make no difference, because Stevens' property could not be legally attached for Sherwood's debt.

The instrument which it is claimed transfers the title of these cattle, attached, from Sherwood to Stevens, is quite long, and the title to several thousand cattle is involved in its interpretation, but this court will not consider those portions of the contract which have no reference to the transfer of the cattle attached in this action, except in so far as it may be necessary to correctly understand that part which covers the 795 cattle involved herein.

The first paragraph of the instrument is as follows:

"Indian Territory, Southern District: Know all Men by These Presents, That I, S. E. Sherwood, of Pickens county, Indian Territory, for and in consideration of the various amounts and prices hereinafter stated, have this day bargained, sold, transferred and delivered to J. R. Stevens, of Cook county, Texas, the following property, to-wit: About 5,200 head of 3, 4 and 5-year-old beef cattle."    *    *

The above provisions are followed by a description of the cattle, giving brands of same and their location, and then concludes:

"It being intended herby to transfer all the cattle I have of the above description wherever the same may be found. Said Stevens is to pay for said cattle when the same are counted out to him at the rate of $22 per head for the 3-year-old cattle, and $26 per head for the 4 and 5-year-old cattle. Said payment is to be made in the manner hereinafter stated."

The second paragraph of the contract, and the one which covers the cattle in this action, is as follows:

"Second. I also bargain, sell, transfer and deliver to said J. R. Stevens, about 1673 steer cattle, also situated in the said 'Looking Glass' pasture, and enroute to the same from Ryan, also a few of said cattle, estimated to be about 300 head, are in my pasture near Ryan. Said cattle are in the following brands, to-wit: Some are branded '777' on left side. Some are branded 'XX' on left side. Some are branded 'V' on left side. Some are branded 'L' on left hip. Some are branded 'K' on left side. And some are branded 'Z' on left side. Said cattle are sold subject to mortgage in favor of Evans-Snyder-Buel company, for $20,025, with interest. It is intended hereby to transfer all the cattle I own of the above description, wherever the same be found. Said Stevens is to take charge of said cattle and look after and care for the same, and he shall sell the same by the 15th of November, 1897. And out of the proceeds of said cattle he shall first pay the pasturage and expenses incident to taking care of said cattle, and amount due on said mortgage, and the remainder of said proceeds he shall turn over to me in the manner hereinafter stated. The said Stevens agrees that I may direct when and at what price said cattle shall be sold, provided that they are sold by the said 15th of November, 1897, but if not sold at said time, the said Stevens shall sell said cattle to whom and in what manner which he deems best. It being expressly understood that the said Stevens does not in any manner assume any liability in reference to said mortgage except to apply such proceeds of said cattle in the payment of the same as it may come into his hands in the manner aforesaid. It being intended by this sale to appropriate such interest as I have in said cattle to the payment of the debts and mortgages owned and controlled by the said J. R. Stevens or C. C. Hemming."

Paragraph 3 of the contract uses the language "bargain, sell, transfer and deliver to said J. R. Stevens 2,200 head of yearling steers," giving the brands and location of the same, and concludes, "the said Stevens agrees to pay for the yearling steers, when counted out to him in the Houston pasture, $11 per head, said payments to be made in the manner hereinafter stated.    It being intended hereby to transfer to said Stevens all this cattle I own of the above description wherever the same may be found."

·Paragraph 4 also uses the language, "bargain, sell, transfer and deliver to said J. R. Stevens 547 cows and their calves for the year 1897, and 20 bulls and 200 head of stock cattle," giving brands and location, and concludes, "And said cattle shall be counted to said Stevens at the time of their removal from said pasture, and when so counted, said Stevens shall pay therefor, the sum of $14 per head, not counting the calves, said payment to be made in the manner hereinafter stated."

Paragraph 5:  "I also bargain sell and transfer to the said Stevens seventy head of saddle horses which I now use in caring for said cattle," giving brands; "also two mare mules," giving descriptions; "also wagon, horses and camp outfit and cooking utensils.  Said property to be delivered to said Stevens at once, with the understanding that I am to use the same gathering and counting said cattle.  Said Stevens is to pay $25 per head for said saddle horses, and $250 for said mules, wagon, harness, and cooking outfit, said payment to be made in the manner hereinafter provided."

Paragraph 6:  "I also transfer and assign to the said Stevens all my interest and lease in and to the said

'Looking Glass' pasture and the said Houston pasture, hereby subrogating said Stevens to my rights under my said lease of said pasture."

Paragraph 7: "I also transfer and assign to the said J. R. Stevens a shipper's contract and rate which I have with Rock Island Railway company, for the shipment of cattle, hereby substituting the said Stevens to all my rights and privileges under the same, and giving him my place and rights in reference thereto."

Here follows a provision, to the effect that Sherwood warrants the title of the cattle described in the contract to Stevens, and also a provision how they shall be counted, and the further statement: "It is intended by this transfer and sale to pass the title and ownership in and to all of said property above described to the said Stevens at once, and he shall take immediate possession and control of the same, and I, the said Sherwood, shall have no further or other thing to do with said property except to gather, drive and count the same as it is provided in this transfer," etc.    *    *

Finally the contract provides:

"The said cattle are to be paid for by the said Stevens at the prices above named, in the following manner: I am indebted to the said J. R. Stevens, and to one C. C. Hemming, in several large amounts, and they hold and control, as agents, other debts. I have at different times given mortgages on the above cattle, many of which debts represent the purchase money for said cattle, and the object of this sale is to enable me to pay said debts. And as soon and as fast as said cattle are counted to said Stevens, he shall place credits on said indebtedness for the amount of the cattle so counted, taking care to place the credit on the particular debt for

which the cattle so counted were mortgaged. Should said property so counted out to the said Stevens at the prices above named amount to more than enough to pay the debts aforesaid, then the said Stevens shall pay the same to me in cash. Should I fail to gather, drive and count said cattle as is herein provided, then the said Stevens shall have the right to gather, drive and count said cattle at my expense, taking said expense out of said cattle before giving me any credit therefor.

"It is intended by this transfer to sell and convey to said Stevens all of my cattle in whatever brand and wherever situated, and should I have omitted the brands of any cattle which I own from the foregoing description, I do hereby express my intention to include all of such cattle and brands as I may own.

"Witness my hand June 28, 1897.

-    "S. E. SHERWOOD."

This instrument was acknowledged before J. W. Phillips, clerk of the district court for the southern dis trict of the Indian Territory, and filed in the office of the register of deeds of Canadian county on July 20, 1897. Is this instrument a bill of sale transferring the absolute title to this property from Sherwood to Stevens, or was it, in fact, executed by Sherwood and accepted by Stevens for the purpose of securing the debts due from Sherwood to Stevens and other persons?

This contract, from a casual reading, seems complicated and difficult to understand, but when one analyzes it carefully, in the light of surrounding facts, as disclosed by the contract itself, its provisions are plain, and the contract is one that would naturally, and quite properly too, grow out of the transaction between Sherwood and his creditors. In giving our interpretation of

this contract we will take up the second paragraph first.
Sherwood owed Stevens a large sum of money, but the
amount is not given in the contract. Sherwood also owed
the Evans-Snyder-Buel company, $20,025, and it had a
chattel mortgage on the lot of cattle, described in this
paragraph, to secure the payment of its claim, which,
as noticed before, was evidenced by two promissory
notes. Stevens may have been pressing for payment
of his claim; at any rate, for some reason known to
themselves, the contract contained in this paragraph of
the instrument was made, and by it it was agreed that
Sherwood should deliver the possession of these cattle
to Stevens; that Stevens should take charge of the cat-
tle, look after and care for the same and sell them at
any time prior to November 15, 1897, and at whatever
price Sherwood should direct; but if a sale was not made
prior to November 15, 1897, then Stevens was to sell at
such time and at such price as he should deem best;
that out of the proceeds of the cattle Stevens was to pay,
first, the pasturage and expenses incident to taking care
of the cattle, and the amount due on the Evans-Snyder-
Buel company's mortgage; and the remainder of the pro-
ceeds was to be turned over to Sherwood, in the manner
thereinafter designated, and the last sentence in this
paragraph shows the manner in which the excess of the
proceeds from the sale of these cattle, after paying the
Evans-Snyder-Buel company's mortgage, should be paid
to Sherwood. Stevens was to appropriate the proceeds
of these cattle, after paying the expenses of pasturing
and caring for the cattle, and the Evans-Snyder-Buel
company's mortgage, to the payment of the debts due
from Sherwood to one C. C. Hemming and himself.

Stevens did not buy this lot of cattle as paragraph 2 (which is the only paragraph of the contract that refers to the cattle attached by plaintiff in error, except possibly a general reference in one other place,) clearly indicates. It is expressly provided in this paragraph that Stevens should not in any manner assume any liability in reference to the mortgage except to apply such proceeds of the cattle as might come into his hands from the sale of the same in payment of such mortgage. As to this bunch of catle no price was fixed, and Stevens guardedly avoided becoming liable for any amount on account of them being turned over to him, except he agreed to be held liable for the money derived from the sale of the cattle. But this is not true with reference to the other paragraphs of the contract. In paragraphs 1, 3, 4 and 5, and in each of them, Stevens buys from Sherwood a specified number of cattle at a fixed price per head, and makes himself absolutely liable for every dollar of the amount. The latter part of the contract, which is quoted above, refers to the cattle embraced in paragraphs 1, 3, 4 and 5, because these paragraphs are the only paragraphs in which a price for the cattle is named. The latter portion of the contract referred to, states that "The said cattle are to be paid for by the said Stevens at the prices above named in the following manner." And then it recites that Sherwood is indebted to Stevens and C. C. Hemming in several large amounts, and that they, as agents, hold and control other debts, to secure which Sherwood had, at different times, given mortgages on the "above cattle;" that many of the debts and mortgages represent the purchase price of the cattle; and that the object of the sale was to pay

those debts. This portion of the contract also provides that, "As soon and as fast as said cattle are counted to said Stevens, he shall place credits on said indebtedness for the amounts of the cattle so counted, taking care to place the credit on the particular debt for which the cattle so counted were mortgaged. Should said property, so counted out to the said Stevens, at the prices above named, amount to more than enough to pay the debts aforesaid, then the said Stevens shall pay the same to me in cash."

It will be seen that Stevens was to pay for these cattle designated in paragraphs 1, 3, 4 and 5, as soon as they were counted out to him at a fixed price, and after paying the debts referred to in the latter part of the contract, if any excess remained in Stevens' hands, it was to be paid to Sherwood "in cash." So far as the cattle referred to in paragraphs 1, 3, 4 and 5, are concerned, the written instrument is an absolute bill of sale, and Stevens was to pay for them as fast as the cattle were counted out to him, and Sherwood was to have no interest in them, except that if the price paid by Stevens amounted to more than the debts owed by Sherwood, Stevens was to pay the amount to Sherwood "in cash." But paragraph 2 is not a bill of sale. Its provisions make it a mortgage; or at least it shows upon its face that it is an instrument by which Sherwood delivered these cattle described therein to Stevens for the purpose of enabling him to hold possession of the cattle to secure the payment of the debts due from Sherwood to Hemming and himself, subject to the prior mortgage of the Evans-Snyder-Buel company. This being true, we think the better authority, as well as the weight of authority, construe it to be a chattel mort-

gage. The authorities go so far as to hold that a bill of sale, absolute upon its face, without a defeasance clause therein, accompanied by an actual delivery of the property, if executed to secure the payment of a debt, will be construed to be a mortgage.

In the case of *Butts v. Privett et al.*, (Kan.) 14 Pac. 247, the supreme court of Kansas held:

"A bill of sale, absolute upon its face, if taken as security, is in effect only a chattel mortgage, and the party executing the same may show, by parol evidence, the real transaction between the parties at the time of the delivery of the written instrument; and may also show that it was the contract that the possession of the personal property described in the written instrument should remain with the mortgagor."

The supreme court of Wisconsin, in the case of *Manf'rs Bank of Milwaukee v. Rugee*, 18 N. W. Rep., p. 251, laid down the rule as follows:

"A bill of sale of chattels, absolute on its face, may be shown, even by those not parties to it, to be a mere security for money, and, as a chattel mortgage, void against subsequent lien-holders, unless filed, or unless possession of the property be given to the mortgagee; and such change of possession must be actual and continuous."

The following rule is laid down by Cobbey in his work on Chattel Mortgages, volume 1, section 82:

"A bill of sale of chattels, absolute on its face, may be shown, even by those not parties to it, to be a mere security for money, and as a chattel mortgage, void against subsequent lienholders, unless filed as required by law. Where a debtor, for the purpose of securing a debt, conveys personal property to his creditor, giving him the possession thereof, with authority to the creditor

to sell the same and account to the debtor for the sur-
plus after paying the debt so secured,together with the
necessary expenses of sale, etc., the instrument by which
the conveyance was made will be treated as a mortgage,
as well between the grantee and the creditors of the
grantor as between the parties to the transfer.     A
bill of sale absolute on its face, but accompanied by a
verbal defeasance, is not only a chattel mortgage as be-
tween the parties to it, but also to third parties who
have actual notice, or such knowledge of the facts as
charges them with notice."

American & English Enc. Law, vol. 5, p. 953: "The
usual form of a chattel mortgage is a bill of sale with
a clause of defeasance, but in general no particular forms
of words are necessary.     Any language indicating a
transfer of property, coupled  with the intent of the
parties that such transfer is for security, will be suffi-
cient."

We think the general rule is that where a debtor by
a written instrument transfers personal property to his
creditor, and delivers possesion of such property to him,
with authority to sell, and, after paying off prior in-
cumbrances, apply the excess to the  payment of his own
claim, no definite price being fixed for the property be-
tween the parties to the instrument, the writing is not
a bill of sale, even though the words "bargain, sell, trans-
fer and deliver" are used therein; but such instrument
will be construed to be a deed of trust or chattel mort-
gage.

The point is raised that even if this instrument from
Sherwood to Stevens is a chattel mortgage, that the
plaintiff in error is not entitled to maintain this action.
Our attention has been called to the case of *Jones et al.*

*v. Graham*, decided by the supreme court of New York, 77 N. Y. p. 628, in which that court enunciated the following rule:

"One not having a judgment and execution is not a creditor within the meaning of the provisions of the statute (sec. 1, ch. 279, Laws of 1833,) declaring that the omission to file a chattel mortgage renders it void as against creditors of the mortgagee, and subsequent purchasers or mortgagees in good faith."

We have not access to the New York statutes in force at the time of the rendition of this decision, and therefore are denied the information as to whether or not the statuts of that state defined a creditor to be one who has obtained judgment and execution; but the word "creditor," as used in our statutes, has a broader meaning.

Section 2657, Statutes of 1893, defines a debtor to be one who, by reason of an existing obligation, is or may become liable to pay money to another, whether such liability is certain or contingent. Section 2653 defines a creditor to be one in whose favor an obligation exists, by reason of which he is, or may become, entitled to the payment of money.

We have not overlooked the fact that a number of the states have held that a general creditor cannot maintain a suit to declare a chattel mortgage void for failure to file, and that such action can only be prosecuted by a judgment creditor. These decisions, however, are based upon the rule that a creditor cannot maintain a suit in equity to cancel a conveyance of his debtor until after his claim is established, and many of the authorities go so far as to hold that an execution must be returned

*nulla bona.* But this is not the rule with an attaching creditor, under our statute. The statute declares an unfiled chattel mortgage void as to creditors, and if the mortgage is not filed, the creditor need not bring a suit to cancel the mortgage, but where legal grounds exist, may ignore the mortgage, and attach the property covered by it.

This brings us to the question of the rights of a mortgagee with possession of property covered by an unfiled chattel mortgage.

At common law the mortgagee held possession of the property as well as the legal title. If the mortgagor was permitted to retain possession, the conveyance was presumptively fraudulent. The rule at common law has been changed by nearly all of the western states, so that the legal title to the property remains in the mortgagor, and where the mortgage or statute so provides, the mortgagor may remain in possession, and as a general rule, if the mortgagor remains in possession, the mortgage must be filed, or the mortgagee will not be protected against the creditors of the mortgagor; but if the mortgagee is in possession of the property, the most of the states protect his rights under his mortgage against the mortgagor's creditors. These rules, however, may be changed or modified to any extent by statute. The statutes of nearly all the states, like those of Kansas, provide that, "Every mortgage, or conveyance intended to operate as a mortgage, of personal property, which shall not be accompanied by an immediate delivery, and be followed by an actual or continued change of possession of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor, and as against

subsequent purchasers and mortgagees in good faith, unless the mortgage, or a true copy thereof, shall be forthwith deposited in the office of the register of deeds in the county where the property shall then be situated."

Oklahoma has gone one step further and ignored the question of possession of the mortgagee. The fact that the mortgagee is in possession, if the mortgage is not properly filed, will not protect the mortgagee against attaching creditors of the mortgagor. The statute in positive terms provides that, "A mortgage of personal property is void as against creditors of the mortgagor, and subsequent purchasers and incumbrancers of the property in good faith for value, unless the original, or an authenticated copy thereof, be filed by depositing the same in the office of the register of deeds of the county where the property mortgaged, or any part thereof, is at the time situated."

From this section it will be seen that possession alone will not suffice. The instrument from Sherwood to Stevens was not signed by two witnesses and consequently was not entitled to be filed in this Territory. The statutes of the Indian Territory, not having been pleaded, the presumption is that this mortgage (or contract) was not entitled to be filed in the Indian Territory unless signed by two witnesses, and the presumption also follows that, under the laws of the Indian Territory, the mortgage is void as against the creditors of the mortgagor, unless properly filed. These presumptions irresistibly force us to the conclusion that if the mortgage is void as against the creditors of the mortgagor in the Indian Territory, where it was made, it is likewise void

as against his creditors in Oklahoma.     We therefore hold that the mortgages of the Evans-Snyder-Buel company, and paragraph 2 of the instrument from Sherwood to Stevens, which we construe to be a deed of trust or mortgage, are absolutely void as against the attachment of the plaintiff in error.

In addition to the foregoing reasons, Stevens is estopped from claiming the property attached against the plaintiff in error.    After the Greenville National bank had attached the cattle, Stevens gave a forthcoming bond as provided by section 4077, of the Statutes of Oklahoma, 1893, which is as follows:

"The sheriff shall deliver the property attached to the person in whose possession it was found, upon the execution, by such person, in the presence of the sheriff, of an undertaking to the plaintiff, with one or more sufficient sureties, resident in the county, to the effect that the parties to the same are bound, in double the appraised value thereof, that the property, or its appraised value in money, shall be forthcoming to answer the judgment of the court in the action; but if it shall appear to the court that any part of said property has been lost or destroyed by unavoidable accident, the value thereof shall be limited to the person so bound."

Our Civil Code of Procedure was adopted from the state of Kansas, and prior to its adoption this section had received a settled construction by the supreme court of that state; and while we are not bound to follow the construction given this section by that court, its decisions are strongly persuasive.

In the case of *Wolf v. Hahn*, 28 Kan., p. 588, Justice Brewer, speaking for the court, said:

"When an order of attachment against property of A, is levied upon personal property in possession of B, and B thereafter procures the execution of a forthcoming bond by C, and the property is then returned to possession of B, *held,* that such bond is not in law the obligation of B; and that both B and his surety C are thereafter estopped to deny that the property so attached and bonded was the propery of A."

And again, in *Case et al. v. Steele et al.* (Kan.) 8 Pac. 242, Valentine, J., followed the same rule, in the following language:

"Where personal property in the possesion of a third person is attached as the property of the defendant. and such third person procures a return of the property to him, by giving to the officer a forthcoming bond for the redelivery of the property or its appraised value to the officer, *held,* that such third person is afterwards, as between himself and the officer, or the plaintiff in the action, estopped from asserting paramount title in himself, or that the property did not belong to the defendant; and this, although the third person may have informed the officer and the plaintiff at the time of the levy that he, the third person, claimed the property under a chattel mortgage; although he agreed in the bond to return the property only upon the order of the court; although he did not by any express terms in the bond, but only impliedly, admit that the property belonged to the defendant; and although there may not have been any other property upon which the attachment could have been levied."

The authorities on this question are very conflicting, but we are satisfied with the construction given this section of our statute by the Kansas courts. A party claiming attached property, either as owner or mortgagee, can always protect his rights by an action in replevin,

or for conversion, or by moving to discharge the attachment in the same action; or he may permit the property to remain in the custody of the law, and file his plea of intervention. A party claiming property attached, as owner or under a special lien, can execute a replevin bond just as easily as he can give a forthcoming bond. We do not see how any injustice can be done one whose property is attached by following the construction given this statute at the time of its adoption by this Territory.

For the reasons herein stated, the judgment of the lower court is reversed, at the costs of the defendants in error, a new trial granted, and the case remanded to the district court of Canadian county, with direction to proceed in conformity with the views expressed herein.

Burford, C. J., having been of counsel in the lower court, not sitting; all of the other Justices concurring.