R. M. COOL, PLAINTIFF IN ERROR, v. ROCHE, HALL & RAY, DEFENDANTS IN ERROR.

1.  **Trial**: CONTRADICTORY STATEMENTS OF WITNESS.  Where evidence showing contradictory statements of a witness is introduced without first calling his attention to the time, place, and person involved in the supposed contradiction, and no objection is made to such evidence, the jury may consider it, and, if sufficient, base their verdict thereon.

2.  **Chattel Mortgage**: RECORD.: NOTICE.  Where a chattel mortgage is duly filed in the county where the mortgagor resides, and is constructive notice there, it will be constructive notice into whatever county the mortgagor may remove with the property.

ERROR to the district court for Antelope county.  Tried below before TIFFANY, J.

*Scott & Gilbert,* for plaintiff in error.

*Thos. O'Day,* for defendants in error.

MAXWELL, CH. J.

In October, 1881, the defendants herein brought an action of replevin to recover the possession of " one bay mare, seven years old, called Kitty, one bay mare, seven years old, called Molly, and one brown horse, eight years old, called General."  The defendants claimed a special ownership in the property by virtue of a chattel mortgage executed by

J. B. Meehan on the 12th day of October, 1880. The answer is a denial of the wrongful detention.

On the trial of the cause the defendants offered in evidence a chattel mortgage on said property, executed on the 12th day of October, 1880, to secure the payment of a promissory note of that date executed by said Meehan for the sum of $200. The plaintiff in error (defendant below) then introduced the deposition of one Bennett, who testifies: "I was a resident of Waco, York county, Nebraska, in 1880, and justice of the peace; was well acquainted with J. B. Meehan and Samantha C. Meehan, who executed the mortgages upon which the defendant relies in this case. One was executed by J. B. Meehan to Oliver Nolan, of date July 12, 1880, and filed in clerk's office, York Co., on same day, and was given to secure part of the purchase price of a horse. None of said claim has been paid, and one mortgage was given by Samantha C. Meehan to secure the payment of $150 borrowed money, all of which remains due and unpaid, except the sum of $3 endorsed on note. Affiant was present when the notes and mortgages were executed and delivered, and the said mortgages cover the identical property in controversy in this case. The note and mortgages were executed by Samantha, and dated July 12th, 1880, and filed in clerk's office, York county, same day. That said Meehans both lived in York county when the said mortgages were executed, and the said property was in York county at that time.

"That at the time said property was replevied in this action, it was in the hands of Cool, as sheriff, by virtue of a writ of replevin at the suit of Will E. Sharp, against one P. D. Thompson, who at that time had possession of it. That affiant was present when property was replevied by these plaintiffs from defendant Cool, and knows that it is the identical property set out in the mortgages given by the Meehans to Nolan & Radford—and that said Sharp is the owner of the notes and mortgages so executed by J. B. and Samantha C. Meehan."

Copies of the mortgages given to Nolan and Radford are set out in the record. The proof tended to show that the mortgages were duly filed in York county.

On behalf of the defendants in error, one Sloan testified that in 1880 he was clerk in the Commercial Hotel, for Dr. Lease, and clerked also at the same hotel for Mr. Meehan. "Am acquainted with John S. Bennett, of Waco. I saw him in October and December, 1880. I recollect at the time he was here, at the time those horses were replevied. I saw him here. At the time the horses were replevied, I saw him here. I was out at the pump at the barn when Bennett went through looking over the horses he claimed he had a chattel mortgage on. He asked me if I knew and asked me to show them to him. I went into the barn. I pointed out the two bay mares described in petition. I showed him several others and he made no reply until I came to these two bay mares that Mr. Roche had afterwards. When I pointed out these he asked me if I wasn't mistaken. He said, 'Those two?' and I said 'Yes, sir.' He says, 'Are you not mistaken?' He told me those were not the horses in that way. He said I must be mistaken. I said again, 'Those are the two,' and he said I was mistaken. I don't recollect Mr. Meehan saying anything about purchasing those mares in St. Paul, this state. The man I was working for said he knew the mare in St. Paul; his brother tried to purchase her. That man was George Nolan. He said he knew that mare before Meehan bought her. I pointed that horse out to Mr. Bennett. He asked me some questions about her, and asked me if I was certain he bought her; I told him I was. Mr. Finch, a lawyer, took a brown horse and a buggy, and a lot of other stuff. I told Mr. Bennett about it, and he said that was the one he wanted."

CROSS-EXAMINATION.

"I refer to brown horse called 'General,' or 'Colonel,' he being the same horse Meehan brought here; called him

Cool v. Roche, Hall & Ray.

'General.' Have referred to bay mares in my testimony, don't remember their names, but were the same mares Roche had, and the ones described in his mortgage. I knew the horses at the time and afterwards. Mr. Bennett wanted to know if I was not mistaken about them, that is the horses Meehan brought here with him. He asked me to go and show him the horses. I showed him two or three, one sorrel. He made no reply or asked any questions. I pointed to the bay mares in the third stall on the left hand side. He said, 'I guess you are mistaken.' I said ' No,' and he said again, 'Are you sure?' "

### RE-DIRECT EXAMINATION.

"Mr. Bennett had been out looking over the horses. I went to the barn. I recollect before this of Mrs. Meehan driving off a pair of bay mares with one of Dr. Lease's buggies. I think she started down from St. Paul; it was to Waco. I remember particularly about it. Dr. Lease was gone, and when Dr. Lease was gone I attended to his business. He found some fault with me about letting it go, and fretted about it considerably."

### JOHN J. ROCHE, RECALLED.

" I remember a conversation in the bank of Neligh, Nebraska, about the 15th of December, 1880, between Thos. O'Day and John S. Bennett, the witness whose deposition has been read, in the presence of Dr. Lease and myself. I asked Mr. Bennett if he had found his property. He said he hadn't, and he was positive the property we had was not the property he wanted. He said, as near as I could find out, the bay team had been driven away from Neligh by Mrs. Meehan, and the brown horse and bay horse had been driven away by somebody else. I think Finch. He said that was the property covered by his mortgage. It was Mrs. Mehan who formerly came from, and he thought she had gone to York where she came from. There was present at that conversation yourself

(meaning Mr. O'Day), Dr. Lease, myself, and Mr. Bennett,. and I think Lewis Warren. That was before this replevin suit commenced. Mr. Meehan told me this property was all clear, and no liens on it whatever."

### CROSS-EXAMINATION.

" The property was in Neligh at the time. Mr. Bennett referred to the property covered by our mortgage. The property in controversy was all included in the mortgage."

### RE-DIRECT EXAMINATION.

".At the time we took the chattel mortgage on this property I had a conversation with Mr. Meehan; he said the property was all clear, no liens on it whatever."

This testimony, so far as the abstract shows, went in without objection, and is sufficient to have warranted the verdict.

The instructions excepted to are set out in the abstract, and are as follows :

" 5. You are instructed that a chattel mortgage is *prima facie* fraudulent as to creditors and *bona fide* purchasers where the mortgagor retains possession of the mortgaged property, and is conclusive evidence of fraud, unless the party claiming under such mortgage was given in good faith.

" 6. You are instructed that when, as in this case, there is a controversy between two mortgagees, the party attacking the *bona fides* or good faith of a prior mortgage must first establish the *bona fides* or good faith of his own mortgage, and in order to do this he must show that he had no notice of the prior incumbrance.

" Applying the law, as above defined, to the case at bar, it would be necessary for the plaintiffs to first prove that their mortgage was taken for a good consideration, and without notice of the prior mortgage, by virtue of which the defendant held the property. If they have established the above, the burden then of proving the good

faith of the mortgages executed in York county were exe-
cuted in good faith, and not in fraud of creditors in order
to overcome the *prima facie* evidence of fraud which at-
taches to them.

"8. If you find, therefore, that the plaintiffs have
shown this good faith of their mortgage, and then that
they were taken without notice of the other mortgages,
your verdict should be for the plaintiffs. If, on the con-
trary, you should find from the evidence that the plaintiffs
have not shown the good faith of their mortgage, and that
the other mortgages were executed in good faith, and that
the plaintiffs had notice of the same, your verdict should
be for the defendant."

The fifth instruction is copied substantially from section
11, chapter 32, Compiled Statutes, the concluding part of
the section being omitted. But the omission was not so
prejudicial to the plaintiff in error as to require a reversal
of the case. The 6th, 7th, and 8th paragraphs, however,
seem to ignore the question of filing the mortgage—of con-
structive notice.

Sec. 14, chapter 32, Compiled Statutes, provides that
"Every mortgage or conveyance intended to operate as a
mortgage of goods and chattels hereafter made, which shall
not be accompanied by an immediate delivery and be fol-
lowed by an actual and continued change of possession of
the things mortgaged, shall be absolutely void as against
the creditors of the mortgagor, and as against subsequent
purchasers and mortgagees in good faith unless the mort-
gage or true copy thereof shall be filed in the office of the
county clerk of the county where the mortgagor executing
the same resides, or in case he is a non-resident of the
state, then in the office of the clerk of the county where
the property mortgaged may be at the time of executing
such mortgage," etc.

Sec. 15 provides for an index of mortgages, and Sec. 16
that the mortgage shall be valid for five years.

A chattel mortgage duly filed in the county in which the mortgagor resides, at the time the same is executed and filed, need not be again filed in the county to which he removes. *Hoit v. Remick,* 11 N. H., 285. *Whitney v. Heywood,* 6 Cush., 82. *Barrows v. Turner,* 50 Me., 127. *Hick v. Williams,* 17 Barb., 523.

In *Kanaga v. Taylor,* 7 O. S., 134, where a chattel mortgage was executed in the state of New York upon certain personal property, which was afterwards, and during the existence of the lien of said mortgage, removed to the state of Ohio, the court held that, the mortgage having been duly recorded in the town where the mortgagor resided at the time of its execution, the lien continued notwithstanding the removal of the property to another state. *Smith v. McLean,* 24 Iowa, 322.

All the cases, so far as we have observed, seem to agree that where a chattel mortgage is duly filed in the proper county so as to be constructive notice in such county, the constructive notice imparted by the record extends to whatever county in the state the mortgagor may remove to while the lien of the mortgage exists. The court, therefore, erred in giving the 6th, 7th and 8th paragraphs of the instruction above set forth. The judgment of the district court is reversed and the case remanded for further proceedings.

REVERSED AND REMANDED.

The other judges concur.