SHAPARD et al. v. HYNES et al.

(Circuit Court of Appeals, Eighth Circuit. October 17, 1900.)

No. 1,367.

1. PARTNERSHIP—LIABILITY OF PARTNERS—TORTS OF CO-PARTNER.
   A defendant cannot be held liable for the tortious act of another on the ground that they were partners, except upon proof that the partnership in fact existed at the time, and that the act was done in relation to the partnership business, with the knowledge and approval or ratification of such defendant, or that it was plainly for the benefit of the firm, and was committed in the usual and ordinary prosecution of the business which the partner committing it was accustomed to transact.

2. CHATTEL MORTGAGES—LIEN—REMOVAL OF PROPERTY TO ANOTHER STATE.
   When a chattel mortgage has been executed and recorded in accordance with the laws of the state where the property is situated, so as to there create a valid lien, such lien will be recognized and given effect, through comity, in another state, to which the property is subsequently removed, in the absence of contrary legislation, although the mortgage is not recorded there, and will not be held subject to the requirements of the statutes of the second state as to the mode of execution and recording.

3. SAME—ATTACHING CREDITOR—CONVERSION.
   A seizure of mortgaged property in the possession of one claiming to hold it under the mortgagee, upon an attachment against him or another than the mortgagee, and against his protest, amounts to a conversion, and entitles the mortgagee to recover its value.

In Error to the United States Court of Appeals in the Indian Territory.

This is a suit for the wrongful seizure and conversion of certain chattels under a writ of attachment. William M. Hynes, his wife, Philomana Hynes, and Clara Smith, as executrix of Samuel H. Smith, deceased, the defendants in error, were the plaintiffs in the lower court, while the plaintiffs in error, S.

104 F.—29

S. Shapard, C. G. Moore, and F. W. Phelps (the latter being the officer by whom the attachment writ was levied), were the defendants. The writ of attachment under which the chattels were seized was issued at the instance of the Shapard Grocery Company, a firm said to have been composed at the time of S. S. Shapard and C. G. Moore, and it ran against J. E. Cottraux, from whose possession the property in controversy was taken. The plaintiffs below claimed to be the absolute owners of the chattels, under a bill of sale absolute on its face, that was executed at San Antonio, Tex., on January 4, 1894, by Philomana Cottraux and Joe Cottraux, her husband, who appear to have been, respectively, the mother and the father of J. E. Cottraux, who was in possession of the chattels at the time they were seized. J. E. Cottraux claimed to have the chattels in his possession at the time of the seizure as lessee of the plaintiffs. The property consisted of a marble soda fountain, marble-top tables, ice-cream freezers, show cases, and the general outfit of a confectionery establishment. It had been moved from Texas into the Indian Territory about 18 months before the seizure, and in the meantime had been in use by J. E. Cottraux, or by his father, Joe Cottraux, at South McAlester, in the Indian Territory, where the seizure took place. When the attachment writ was levied the property was loaded in a car for the purpose of transporting it to some point in Texas, and it was taken from the car, and a portion of it was subsequently sold. Shortly after the seizure, and prior to the sale, J. E. Cottraux served a written notice on S. S. Shapard, one of the attaching creditors, that the property belonged to the plaintiffs, and that they were entitled to its immediate possession. This notice, however, was disregarded, and a part of the property was sold to satisfy the claim of the attaching creditors. After the sale the attaching creditors offered to return to J. E. Cottraux, as agent of J. P. Cottraux (probably meaning his father, Joe Cottraux), such of the property as remained unsold. This offer was declined. The trial resulted in a verdict and judgment for the plaintiffs below in the sum of $520. This judgment was affirmed by the court of appeals in the Indian Territory, and the case has been brought hither for review.

Samuel A. Wilkinson and Wallace Wilkinson, for plaintiffs in error.

Charles B. Stuart, Yancey Lewis, and J. H. Gordon, for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

One of the issues that was raised on the trial below was whether the defendant C. G. Moore was a partner of S. S. Shapard at the time the latter directed the levy of the writ of attachment. The trial court disposed of this issue as a matter of law, instructing the jury, in substance, that Moore was a partner of Shapard at the date of the levy and sale, and that, being such, he was liable for the wrongful act of Shapard in directing the levy, if it was in fact wrongful, although he was not present, and neither directed the levy to be made, nor authorized the subsequent sale of the attached property. To this instruction an exception was taken, which presents one of the principal questions to be considered.

The testimony in the case concerning the existence of the alleged co-partnership was, in substance, as follows: Moore lived at Eufaula, in the Indian Territory, a considerable distance from South McAlester. About two years prior to January 1, 1897, he formed a co-partnership with Shapard for the purpose of carrying on the grocery business at South McAlester. By the terms of the agreement,

Shapard was to conduct the business in the name of the Shapard Grocery Company, and was to have full charge thereof, but Moore was to furnish the capital. Moore's name was not used in the business, and, as he testified, he was not generally known as being a member of the firm. On January 1, 1897, Shapard bought Moore's interest in the business, agreeing to pay him therefor $1,800, at the rate of $125 per month. This agreement, it seems, was oral. Four monthly payments were made in pursuance of the agreement, but no notice of a dissolution of the firm was published, and it was understood between the partners that Shapard should run the business, as before, in the name of the Shapard Grocery Company. Moore had no knowledge of the levy of the writ of attachment on the property of the plaintiffs, which was made, as it seems, in the month of April, 1897, and neither derived a benefit from the levy, nor took part in any of the proceedings which culminated in a sale of the attached property. His first knowledge that an attachment writ had been issued and levied was acquired from Shapard after the present action was instituted, when he was advised by Shapard that the suit would not trouble him in any way. In June, 1897, Shapard sold a half interest in the business of the Shapard Grocery Company to one Ambrose, doing so with Moore's consent. Ambrose, it seems, paid $500 on account of his purchase, but failed to pay the residue of the purchase price. Later in the season, on or about September 1, 1897, Shapard having failed in business, and being unable to complete his monthly payments, Moore was compelled to take possession of the stock of goods then belonging to the Shapard Grocery Company, and he did so with Shapard's consent. At that time the grocery company was involved in debt, and Moore was compelled to pay, or at least did pay, $2,000 to satisfy claims against the grocery company. Notwithstanding the testimony aforesaid, which seems to have an obvious tendency to show that Moore was not a partner of Shapard at the time of the alleged wrongful seizure and sale of the property in controversy, and that he was in no sense responsible for the willful trespass of Shapard, the learned judge of the trial court seems to have entertained the view that Moore must be held responsible for the wrongful acts of Shapard, by the operation of the doctrine of estoppel. In the instructions given, the attention of the jury was directed to evidence which showed that the parties had once been partners; that some people knew that Moore was a member of the firm; that the firm was afterwards secretly dissolved, without letting the public know the fact; that the business was thereafter conducted in the old firm name; and in view of these facts the jury were told that Moore must be regarded as a partner of Shapard, and liable for all of his tortious acts in conducting the firm business. Obviously, therefore, the trial court held Moore responsible for the conduct of Shapard, by the operation of the principle of estoppel, without any reference to their actual relations inter sese. We are of opinion that this view was erroneous, because the object of the suit was not to charge Moore with a contractual liability to some one with whom the firm had formerly dealt, but to make him respond for a willful tort said to have been committed by Shapard. In such an action it

was necessary for the plaintiffs to show that the relation of partners actually existed between them, and that the wrongful act was either done with the knowledge and approval of Moore, or that it was done for his benefit and in his behalf, and that he subsequently ratified it, or that it was plainly committed for the benefit of the firm, in the usual and ordinary prosecution of that part of the firm's business which Shapard was accustomed to transact. Add. Torts (6th Ed.) § 82; Lindl. Partn. (2d Am. Ed.) p. 150; Jag. Torts, pp. 271–293; Webb, Pol. Torts, p. 114, and cases cited. In view of the nature of the action, the trial court erred in forcing Moore into the position of a partner, by erecting an estoppel, and then holding him accountable for the acts of Shapard, as if the relation of partners actually existed. The jury should have been left to determine from the evidence, under appropriate instructions, if Moore and Shapard were partners in fact; and they should also have been instructed as to the circumstances which would render the former responsible for the willful torts of the latter, provided the jury found that a partnership actually existed.

A controversy arose at the trial as to whether the bill of sale under which the plaintiffs derived title, which was executed at San Antonio, Tex., on January 4, 1894, was a bill of sale, as it purported to be, or in reality a mortgage given to secure a loan for the sum of $800, which was the consideration expressed in the bill of sale. There was some evidence to the latter effect contained in an affidavit for a continuance which the trial court permitted to be read. The plaintiffs contended that the instrument was what it purported to be, to wit, an absolute bill of sale. In view of this controversy the trial court instructed the jury, in substance, that, even if the plaintiffs did own the property by virtue of a mortgage recorded in Texas (and the bill of sale in question was there recorded), the plaintiffs might nevertheless recover, if the defendants had actual notice of the record of the mortgage when they levied upon and sold the property. The defendants below reserved an exception to this part of the charge, and they assign two reasons why it was erroneous. First, they say, in substance, that the attached chattels "were not recently brought from another state," but had been in the Indian Territory for about 18 months prior to the levy, and were liable to be attached for the debts of Cottraux; second, that the plaintiffs, if mortgagees, could not follow the property into another state, and sue a creditor of one who had the mortgaged property in his possession for attaching and selling it "without first showing that there was not sufficient property left to satisfy their debt."

There has been much discussion concerning the effect of the removal of mortgaged goods and chattels from the state where the mortgage was made and recorded, to another state. The general consensus of judicial opinion seems to be that when personal property, which at the time is situated in a given state, is there mortgaged by the owner, and the mortgage is duly executed and recorded in the mode required by the local law, so as to create a valid lien, the lien remains good and effectual, although the property is removed to another state, either with or without the consent of the

mortgagee, and although the mortgage is not re-recorded in the state to which the removal is made. The mortgage lien is given effect, however, in the state to which the property is removed, solely by virtue of the doctrine of comity. Hence a state may by appropriate legislation decline to observe the rule of comity, 'and may require all mortgages affecting personal property which is situated therein or brought therein to be there recorded, as a condition precedent to the recognition of their validity in that state. But the statutes of a state which prescribe how mortgages on personal property shall be executed and recorded are generally, if not universally, regarded as speaking with respect to mortgages made within the state upon property there situated, and as having no reference to personalty brought within the state which is at the time incumbered with a valid lien created elsewhere. These propositions are fully sustained by the following authorities: Hornthal v. Burwell, 109 N. C. 10, 13 S. E. 721, 13 L. R. A. 740; Smith v. McLean, 24 Iowa, 322, 328, 329; Handley v. Harris, 48 Kan. 606, 29 Pac. 1145, 17 L. R. A. 703; Bank v. Morris, 114 Mo. 255, 21 S. W. 511, 19 L. R. A. 463; Kanaga v. Taylor, 7 Ohio St. 134; Langworthy v. Little, 12 Cush. 109; Whitney v. Heywood, 6 Cush. 82; Iron Works v. Warren, 76 Ind. 512; Feurt v. Rowell, 62 Mo. 524, 526; Cool v. Roche, 20 Neb. 550, 556, 31 N. W. 367; Keenan v. Stimson, 32 Minn. 377, 20 N. W. 364; Offutt v. Flagg, 10 N. H. 46; Lathe v. Schoff, 60 N. H. 34; Barrows v. Turner, 50 Me. 127; Hall v. Pillow, 31 Ark. 32; Mumford v. Canty, 50 Ill. 370; Ballard v. Winter, 12 Am. Law Reg. (N. S.) 759; Jones, Chat. Mortg. (4th Ed.) § 260. So far as our research has extended, Michigan is the only state which declines to recognize the validity of a mortgage lien upon personal property brought within its borders that was created elsewhere, and which maintains the superiority of an attachment lien acquired in a suit commenced in that state against the mortgagor, who has the property in his possession. Corbett v. Littlefield, 84 Mich. 30, 47 N. W. 581, 11 L. R. A. 95; Boydson v. Goodrich, 49 Mich. 66, 12 N. W. 913. The decision in Green v. Van Buskirk, 7 Wall. 139, 150, 19 L. Ed. 109, is not in conflict with the doctrines stated above, since the mortgaged property that was involved in that case was located in Illinois at the date of the mortgage, which was executed in New York, and the court was unable to give to the legal fiction that the domicile of the owner draws to it all of his personal property such force and effect as to remove the property in controversy from the operation of the laws of the state of Illinois, and subject it to the operation of the laws of New York. Sections 4742 and 4743 of Mansfield's Digest of the Laws of Arkansas (sections 3053, 3054, Ind. T. Ann. St. 1899), relative to the execution and recording of mortgages, which were in force in the Indian Territory until modified, as to the place where mortgages of personal property shall be recorded, by the act of congress approved February 3, 1897 (29 Stat. 510, c. 136), have reference only to mortgages made in that territory upon property there located (Bank v. Lee, 13 Pet. 107, 120, 10 L. Ed. 81); and, within the doctrine above stated, they cannot be given effect to destroy the lien of the instrument under which the plaintiffs claim

title to the property in controversy, that was executed and recorded in Texas, where the property was at the time located, and where both the mortgagors and the mortgagees at that time resided. Even if that instrument was intended as a mortgage, and not as an absolute bill of sale, the lien thereby created followed the property into the Indian Territory, and was rightly given effect by comity, and should have been given effect even if the attaching creditors did not have actual notice of the existence and record of the instrument at the date of the levy, since no effort was made in the trial court to impeach the instrument for fraud, or to question the consideration upon which it was founded.

As respects the second contention stated above,—that the defendants below, if the plaintiffs were merely mortgagees, were not guilty of a tortious act, or, in other words, of a conversion, in levying on the property in controversy, unless after the levy and sale there was not enough of the mortgaged property left to satisfy the mortgagees' debt,—this may be said: Some courts have held that a levy made upon mortgaged personal property in the possession of the mortgagor under a writ of attachment or execution against him does not amount to a conversion, because a sale, if made, under the writ, only conveys the mortgagor's right of possession and his equity of redemption, and does not destroy the mortgagee's interest. Manning v. Monaghan, 28 N. Y. 585. Other courts, however, maintain the contrary view, holding that a seizure of mortgaged personal property against the protest of the mortgagee amounts to a conversion. McConeghy v. McCaw, 31 Ala. 447; Frisbee v. Langworthy, 11 Wis. 375; Tannahill v. Tuttle, 3 Mich. 104. And this is said by Mr. Jones, in his treatise on Chattel Mortgages, to be the better rule, especially where the officer assumes to sell the entire interest when he has notice of the mortgage. Jones, Chat. Mortg. § 561, and note thereto. In the case in hand the evidence shows that the mortgaged property, when seized, was not in the custody of the mortgagors, but was in the actual possession of J. E. Cottraux, who claimed to hold it as a lessee of the plaintiffs. The present record does not show with certainty that the writ of attachment under which the property was seized ran against either of the mortgagors, but rather indicates that it ran against the son of the mortgagors, to wit, J. E. Cottraux. The plaintiffs also at the time of the levy would seem to have been entitled to the immediate possession of the property in controversy, even if they were merely mortgagees. Moreover, the attaching creditors were notified before the sale that the plaintiffs were the owners of the property, and they disregarded the notice altogether, by assuming to sell it, or so much thereof as was necessary to satisfy their claim, as the absolute property of their debtor, and thereafter appropriated the proceeds of the sale. After the sale the offer that they appear to have made to restore the residue of the property which remained unsold was an offer to restore it, not to the plaintiffs, but to J. E. Cottraux, as the agent of one of the mortgagors. Under these circumstances, we are of opinion that the acts of the attaching creditors amounted to a conversion of the property, and entitled the plaintiffs to recover the fair

market value of all the property that was described in the bill of sale, even if the jury believed that instrument to be merely a mortgage. The result is that we find no error in the instruction of the trial court last considered of which the defendants below are entitled to complain.

Some other questions are discussed in the briefs, which have been considered, but they do not require special notice. As the trial court erred in that part of its charge heretofore considered, which declared, as a matter of law, that Moore was a partner of Shapard, and was responsible for his acts if they were tortious, the judgment of the United States court of appeals in the Indian Territory and the judgment of the United States court for the Central district of the Indian Territory must be reversed, and the case remanded for a new trial. It is so ordered.