21 P.(2d) 96

## HART v. OLIVER FARM EQUIPMENT SALES CO.

### No. 3698.

Supreme Court of New Mexico.

April 17, 1933.

H. M. Rodrick, of Raton, for appellant.

F. S. Merriau, of Raton, for appellee.

HUDSPETH, Justice.

The facts material to the issues now before the court were, as found by the trial court, briefly as follows:

In January, 1930, the defendant, W. B. Thompson, who was then residing in Hartley, Tex., executed and delivered to the B. M. Golloday Implement Company, intervener's assignor, a chattel mortgage upon a Hart-Parr tractor and a conditional sale contract upon an Oliver ten-foot one-way plow. The former was given as security for the payment of certain promissory notes, and the latter to secure the balance of the purchase price of the plow. The transactions took place in Texas, where the property was at the time situated. The mortgage and conditional sale contract were properly and regularly filed for record in Hartley county, Tex., in accordance with the laws of Texas then in effect. Sub-

sequently, Thompson, without the knowledge or consent of the mortgagee and conditional vendor, and in violation of the express terms of the mortgage and contract and of the civil and criminal statutes of Texas, removed the tractor and plow from Texas to Colfax county, N. M. The mortgage and contract were not recorded in New Mexico. On July 29, 1930, plaintiff, C. B. Hart, doing business as the Hart Oil Company, began suit by attachment against Thompson in the district court of Colfax county to recover for goods sold and delivered to defendant and upon some bad checks issued by him. The plaintiff had no knowledge of the existence of any incumbrances upon the tractor and plow at the time he levied his attachment thereon. Subsequently, the Oliver Farm Equipment Sales Company, assignee and holder of the mortgage and conditional sales contract, intervened in the plaintiff's suit against Thompson, attacking the sufficiency of plaintiff's levy of attachment, and setting up, among other things, its claim to a lien upon the property covered by its mortgage and contract superior to that of plaintiff's attachment. Upon a trial of the case on February 19, 1931, the plaintiff was given judgment in rem against the defendant, who had not appeared in the action, for the full amount of his claim. In its conclusion of law No. 4 the court held that although the intervener had a valid lien upon the tractor covered by its mortgage, plaintiff's attachment lien was "prior and superior to intervenor's claim to lien by its chattel mortgage upon said tractor under the rule of comity and reciprocity between sister

states and because of the generally adopted position of the courts of the State of Texas in giving priority to attaching creditors, subsequent purchasers and incumbrancers in the state of Texas over foreign mortgages or other liens or reservations of title on personal property, even though they may have been duly lodged for record according to the laws of said foreign state." In its conclusion of law No. 5, the court held "plaintiff's said lien is prior and superior in all respects to any right, claim, title, interest or lien of intervenor in or to said so-called Gold Digger Plow under its conditional sale contract for the same reasons as those set forth in the last preceding paragraph and for the further reason that said conditional sale contract itself is so defective as to description and location of the property purported to be covered thereby as to be wholly invalid as to subsequent purchasers, encumbrancers or attaching creditors."

From the judgment and findings of the court, the intervener prosecutes an appeal to this court.

Appellant bases points for reversal upon three distinct propositions, namely: (1) That the plaintiff's attempted levy of attachment upon the tractor and plow was insufficient, and that therefore plaintiff had never acquired a valid attachment lien thereon; (2) that, even though plaintiff had acquired the status of an attachment creditor, appellant's mortgage and vendor's liens were entitled to priority over plaintiff's attachment lien; (3) that the description of the plow contained in appellant's conditional sale contract was sufficiently definite to render the incumbrance valid as against attaching creditors of the conditional vendee.

For reasons which will hereafter appear, we think that the findings of the trial court should be upheld in so far as they relate to the first and third of the appellant's propositions. However, the question raised by the second of appellant's allegations of error, which is directed to the trial court's conclusion of law No. 4, is one of considerable importance and one which has never before been passed upon by this court.

██ The validity of the intervener's mortgage as against the mortgagor, which is to be tested by the law of Texas, the place where the mortgage was executed and where the property was situated at the time of its execution, is undisputed. The question of the priority of the mortgage lien as against plaintiff's attachment lien is to be determined not by the law of Texas, but by the law of New Mexico, by virtue of its being not only the forum, but also the place where the property was situated at the time of the levy of attachment. See Wharton on Conflict of Laws, Vol. I, § 324 (2d Ed.); cf. United States Fidelity & Guaranty Co. v. Northwest Engineering Co., 146 Miss. 476, 112 So. 580, 57 A. L. R. 530; Marvin Safe Co. v. Norton, 48 N. J. Law, 410, 7 A. 418, 57 Am. Rep. 566; Weinstein v. Freyer, 93 Ala. 257, 9 So. 285, 12 L. R. A. 700; Public Parks Amusement Co. v. Embree-McLean Carriage Co., 64 Ark. 29, 40 S. W. 582; Aultman & T. Mach. Co. v. Ken-

nedy, 114 Iowa, 444, 87 N. W. 435, 89 Am. St. Rep. 373.

Section 21-102 of the New Mexico Statutes, 1929 Compilation, provides that: "Every chattel mortgage shall be acknowledged in the manner provided by law for the acknowledgment of conveyances affecting real estate, and such chattel mortgage, or a copy thereof, shall be filed in the office of the county clerk of the county in which the property affected is located or is about to be removed. Failure to so file such chattel mortgage, or copy thereof, shall render the same void as to subsequent purchasers or mortgagees without notice, as to judgment or attaching creditors from the date of entry of such judgment or levy of such attachment. * * *"

Similar statutes, differing from the New Mexico statute in details, are found on the statute books of several states, among them Texas. However, the generally accepted view is that these local recording statutes, as comprehensive in their terms as that of New Mexico, are inapplicable to mortgages given on property which is located outside of the state at the time of the execution of the mortgage and subsequently brought within the borders of the state without the knowledge or consent of the mortgagee. Jones, Chattel Mortgages (5th Ed.) § 260-a; Bank of U. S. v. Lee, 13 Pet. 107, 10 L. Ed. 81, 88; Parr v. Brady, 37 N. J. Law, 201; Shapard v. Hynes, 45 C. C. A. 271, 104 F. 449, 52 L. R. A. 675; Barker v. Stacy, 25 Miss. 471; Hornthal v. Burwell, 109 N. C. 10. 13 S. E. 721, 13 L. R. A. 740, 26 Am. St. Rep. 556; Greenville

National Bank v. Evans-Snyder-Buel Co., 9 Okl. 353, 60 P. 249; see, also, notes, 64 L. R. A. 357 and 57 A. L. R. 723. Indeed, there are suggestions that recording statutes, interpreted to include within their scope such foreign mortgages, may be unconstitutional. See Greenville v. Evans-Snyder-Buel Co., supra; Beale, Jurisdiction over Title of Absent Owner in a Chattel, 40 Harv. Law Rev., at page 810; cf. Goetschius v. Brightman, 245 N. Y. 186, 156 N. E. 660.

A statement frequently quoted in the cases is that found in 11 Corpus Juris, page 424: "The great weight of authority is to the effect that a chattel mortgage properly executed and recorded according to the law of the place where the mortgage is executed and the property is located, will, if valid there, be held valid even as against creditors and purchasers in good faith in another state to which the property is removed by the mortgagor, unless there is some statute in that state to the contrary, or unless the transaction contravenes the settled law or policy of the Forum."

The view taken by the courts of Texas, contrary to the view taken by the majority jurisdictions, is that, unless the mortgage on property brought into the state is re-recorded in Texas, the lien of such mortgage is invalid as against subsequent bona fide purchasers (Consolidated Garage Co. v. Chambers, 111 Tex. 293, 231 S. W. 1072, 1073; Farmer v. Evans, 111 Tex. 283, 233 S. W. 101), and probably as against mere attachment creditors, otherwise unsecured, as in the case at

bar. See Trans-Continental Freight Co. v. Packard North Texas Motor Co. (Tex. Civ. App.) 11 S.W.(2d) 362. The assumptions back of the Texas view seem to be that recordation of a mortgage operates as constructive notice of the incumbrance only within the territorial limits of the state of recordation, and that the recording statute of Texas declares a policy to protect those innocently dealing with property against the undisclosed or secret reservation of title, "whether the same was contracted within this state or without." Consolidated Garage Co. v. Chambers, supra. The contrary doctrine, and the one which we believe to embody the sounder view, is that it violates no public policy of the state to enforce, as against those included within the protection of the local recording statute, a mortgage executed upon the property in another state prior to its surreptitious removal therefrom, even though it is not recorded in the state into which the property is removed and where the subsequent dealings occur. See cases cited supra, and, see, also, Davis v. Standard Accident Ins. Co., 35 Ariz. 392, 278 P. 384, 386; Mercantile Acceptance Corp. v. Frank, 203 Cal. 483, 265 P. 190, 57 A. L. R. 696; Newsum v. Hoffman, 124 Tenn. 369, 137 S. W. 490; Mosko v. Matthews, 87 Colo. 55, 284 P. 1021, 1023; Jerome P. Parker-Harris v. Stephens, 205 Mo. App. 373, 224 S. W. 1036; Farmers' & M. State Bank v. Sutherlin, 93 Neb. 707, 141 N. W. 827, 46 L. R. A. (N. S.) 95, Ann. Cas. 1914B, 1250; Nat. Bank of Commerce v. Morris, 114 Mo. 255, 21 S. W. 511, 19 L. R. A. 463, 35 Am. St. Rep. 754; cf.

Forgan v. Bainbridge, 34 Ariz. 408, 274 P. 155, 157. In Motor Investment Co. v. Breslauer, 64 Cal. App. 230, 221 P. 700, 703, the court made this comment on the rule protecting the lien of foreign mortgages: "The principle underlying it may be analogized to that upon which the owner of property stolen from him and taken * * * to another state may follow the thief into the latter state and reclaim or retake possession of the pilfered goods or chattels wherever found. A state may, it is true, refuse to recognize the rule of comity in such cases; but, should it do so, it would become a party to every such fraudulent transaction. It is not going too far to say and to hold that it is preferable and more desirable that an innocent purchaser or incumbrancer of personal property brought into a state under such circumstances as those characterizing the transaction with which we are here concerned should suffer loss, which possibly his own improvidence or want of diligence has brought to him, than that the state should assume and maintain an attitude towards such transaction which would necessarily stigmatize it as an accessory after the fact to the fraud inhering therein."

The analogy to the case of stolen property is the more persuasive here, in view of the fact that the removal of property by the mortgagor from the place where the mortgage is recorded, without the consent of the mortgagee and in violation of the terms of the mortgage instrument, is a penal offense, not only under the statutes of Texas, but also under the New Mexico statutes. See article

1558 of the Penal Code of Texas 1925; section 21-111 of the New Mexico Statutes, 1929 Compilation.

█ The rule followed by the majority jurisdictions is generally referred to as a "rule of comity." See authorities cited supra, and see, also, 5 R. C. L. § 68, page 987. These statements of the nature of the rule should perhaps be regarded as mere dicta. ·However, they occur too frequently in the cases to be ignored. One of the articulate reasons sometimes given in the cases for applying the ·"rule of comity" is that such a holding tends to induce reciprocal treatment in other states of mortgages which have been executed in the forum. We are called upon here to determine whether or not the converse of the proposition implied in such, reasoning is sound. More specifically, should this court refuse to uphold the validity, as against attaching creditors in this state, of a mortgage lien, validly acquired in another state because, if the situation were reversed, the holder of a New Mexico mortgage would not, in such other state, be accorded protection as against attaching creditors?

The only case which we have been able to find which passed upon a similar point is Union Securities Co. v. Adams, 33 Wyo. 45, 236 P. 513, 517, 50 A. L. R. 23. In that case the court had before it a question similar to the one involved in the case at bar, except that the contest in that case was between a bona fide purchaser of the property in Wyoming after its surreptitious removal thereto, and a Texas mortgagee. The court

held for the purchaser as against the holder of the Texas mortgage, although the same court, in two previous cases, involving mortgages given in states other than those following the Texas view, had upheld the foreign mortgages, which had not been recorded in Wyoming, against the claims of purchasers in Wyoming. The reason given for reaching a different result was, in substance, the same ·as that given by the trial court in the case at bar for subjecting the lien of the Texas mortgage involved in this case to the lien of the New Mexico attachment creditor.

Judge Blume, in a very scholarly opinion, reviewed a number of authorities discussing the questions of comity and reciprocity. and concluded: "The principle of comity is throughout the civilized world based upon mutuality and reciprocity, and where it appears that no such reciprocity is extended, none is generally granted in return."

We have carefully examined the authorities cited, and are unable to agree that they either warrant or dictate such a broad conclusion.

Dicta to the effect that reciprocity is the basis of comity are, it is true, thrown out in Re McCoskey's Estate, 22 Abb. N. C. 20, 1 N. Y. S. 782; Rutledge v. Krauss, 73 N. J. Law, 397, 63 A. 988, 989; Traders Trust Co. v. Davidson, 146 Minn. 224, 178 N. W. 735; King v. Sarria, 69 N. Y. 24, 25 Am. Rep. 128; McEwan v. Zimmer, 38 Mich. 765, 31 Am. Rep. 332. However, the decisions in none of these cases hinged upon that proposition, nor were they in any way influenced by it.

Other of the cases were decided almost a century ago—some of them indeed more than a century ago. In Holmes v. Remsen, 20 Johns. (N. Y.) 229, 11 Am. Dec. 269, decided in 1822, the court considered that, in the determination of whether or not extraterritorial effect should be given to the English Bankruptcy statutes, the lack of assurance that such recognition would be reciprocated by England was a material factor. In Re Santa Cruz, 165 Eng. Repr. 92, decided in 1798, can be cited for no more than that "the law of England, on recapture of property by allies is the law of reciprocity, adopting the rule of the country to which the claimant belongs." Bradstreet v. Neptune Insurance Co., Fed. Cas. No. 1,793, decided in 1839, and Burnham v. Webster, Fed. Cas. No. 2,179, decided in 1846, both involved questions of the conclusiveness or recognition to be accorded to the judgment and record of proceedings of a judicial tribunal of a foreign nation. Looked at empirically, none of these cases would seem persuasive in determining whether or not the principle of reciprocity should be extended to situations similar to the one involved in the case at bar.

Of the modern cases, one of the most frequently cited on the question of the importance of reciprocity is Hilton v. Guyot, 159 U. S. 113, 16 S. Ct. 139, 40 L. Ed. 95. In that case the court refused to recognize the conclusiveness of a judgment rendered by a French court because French courts, under the laws of France, did not accord full recognition to similar judgments rendered by

our courts. It has been pointed out that the same decision could have been reached on other grounds, Johnston v. Compagnie Generale Transatlantique, 242 N. Y. 381, 152 N. E. 121, 46 A. L. R. 435, and it has been held that the doctrine of the case is not applicable to all foreign judgments, but only to executory judgments for the recovery of money. Gould v. Gould, 201 App. Div. 127, 194 N. Y. S. 122. Moreover, the authority of Hilton v. Guyot on questions other than those relating to the recognition of foreign judgments is extremely doubtful. See Direction der Disconto-Gesellschaft v. United States Steel Corp. (D. C.) 300 F. 741, 747, affirmed in 267 U. S. 22, 45 S. Ct. 207, 69 L. Ed. 495.

The case last cited involved the question of the title to shares of stock in the United States Steel Corporation. Sales of the stock had been made in England by the public trustee under a statute empowering him to seize and acquire title to the property of aliens within the realm. The contention was made by the plaintiff that it did not appear that England, in a converse situation, would recognize United States law as controlling and that, therefore, the title acquired by virtue of the sale under the English law should not be recognized. In answer to this contention, Judge Learned Hand said: "The point depends upon a misunderstanding of the effect of the case of Hilton v. Guyot, supra, 159 U. S. 113, 16 S. Ct. 139, 40 L. Ed. 95. Whatever may be thought of that decision, the court certainly did not mean to hold that an American court was to recognize no obligations or

duties arising elsewhere until it appeared that the sovereign of the locus reciprocally recognized similar obligations existing here. That doctrine, I am happy to say, is not a part of American jurisprudence. It is true that a judgment creates a debt, and is, indeed, an instance of the general principle. But it is a most especial instance, and no generalizations may properly be drawn from it. A judgment involves the direct action of a court against individuals, and offers more excuse for national jealousy than when the obligation arises from laws of general application. So far as I know, the doctrine of reciprocity has been confined to foreign judgments alone, and has no application to situations of this sort."

We know of only one instance of its extension in the modern cases. In Re John L. Nelson & Bro. Co. (D. C.) 149 F. 590, decided in 1907, the court gave as a reason for its decision giving preference to a New York attaching creditor as against an assignee for the benefit of creditors appointed by an Illinois court the fact that, were the situation reversed, an Illinois attaching creditor would by the Illinois courts be given a preference over an assignee for the benefit of creditors appointed by a New York court.

The decision in Wabash R. Co. v. Fox, 64 Ohio St. 133, 59 N. E. 888, 889, 83 Am. St. Rep. 739, a case containing language approving the doctrine, was dictated by a statute which read: "Whenever death has been * * * caused by a wrongful act * * * in another state * * * for which a right to maintain an action * * * is given by a statute of such other state, * * * such right of action may be enforced in this state * * * where such other state * * * allows the enforcement in its courts of the statute of this state of a like character."

Its significance as authority on the question is discussed in Wabash R. Co. v. Hassett, 170 Ind. 370, 83 N. E. 705, 709, wherein it is said: "It is argued that jurisdiction of a cause of action arising under the statute of one state is sustained by the courts of another only upon the ground of comity or reciprocity, and, since the courts of Illinois cannot entertain a similar cause of action arising under the statute of this state, the requisite reciprocity is wanting and jurisdiction of our courts over this action must fail. The cases cited which seemingly support this doctrine are: Baltimore & Ohio R. Co. v. Chambers, 73 Ohio St. 16, 76 N. E. 91 [11 L. R. A. (N. S.) 1012]; Wabash R. Co. v. Fox, 64 Ohio St. 133, 59 N. E. 888, 83 Am. St. Rep. 739. These Ohio decisions were based upon a statute permitting actions for wrongful death occasioned in another state to be enforced in that state only where such other state allowed the statutes of Ohio of a like character to be enforced in its courts. The reciprocity policy of Ohio was thus embodied in a positive statute. The English rule is to the same effect. 22 Am. & Eng. Ency. of Law, 1379. The doctrine of reciprocity is a fair and reasonable principle to govern the conduct of independent nations in affording relief to aliens through their courts. The

people of the United States comprise one nation, banded together, among other reasons, to 'establish justice' and 'to promote the general welfare.' Each state may undoubtedly limit the jurisdiction of its courts and formulate its local policy; but in the absence of a state policy declared and restricted by statute, the rule contended for is too narrow and illiberal to meet our approval."

We believe that the most that can be deduced from the cases is that courts, in refusing to accord recognition to rights based upon the law of, or transactions occurring in, another state or country, have sometimes, and in a few situations, been influenced by the fact that the courts of that state or country would not recognize similar rights arising at the forum. On the other hand, there are several cases in which courts have expressly refused to make reciprocity a test for the enforcement of rights acquired outside of the jurisdiction of the forum, and have enforced them in spite of a lack of reciprocity. Among such cases are: Wabash R. Co. v. Hassett, supra; Union Guardian Trust Co. v. Broadway National Bank & Trust Co., 138 Misc. 16, 245 N. Y. S. 2; Gould v. Gould, 201 App. Div. 127, 194 N. Y. S. 122; Johnston v. Compagnie Generale Transatlantique, supra; The Pesaro (D. C.) 277 F. 473; Id. (D. C.) 13 F.(2d) 468, affirmed in 271 U. S. 562, 46 S. Ct. 611, 70 L. Ed. 1088; see, also, authorities collected in a note, 50 A. L. R. 30. These, the more recent cases on the question, would seem to indicate a modern tendency to restrict the doctrine. In this state of the authorities, we feel that we would not be warranted in extending the doctrine of reciprocity to the situation involved in the case at bar, unless there exist persuasive practical reasons for so doing.

In the Union Securities Company Case, the court said: "Suppose one of our neighboring sister states should refuse to reciprocate in treating as valid Wyoming mortgages duly filed of record in accordance with our laws, as against innocent purchasers in that state. We have no doubt that such holding would have a tendency to increase unlawful removals of mortgaged automobiles and other personal property from this state to that. If we should still continue to apply the principle of comity without reciprocity, we should not alone injure citizens of this state, whose protection is our first duty, but we should also, indirectly, encourage such unlawful removals and dishonest conduct. That, so far as in us lies, we shall not do."

We are unable to agree with the Wyoming court that this is the practical implication of a decision upholding the lien of a valid Texas mortgage as against bona fide purchasers, or—which is all we are here called upon to decide—as against mere attaching creditors.

Professor Beale, author of the Restatement of Conflict of Laws, says in an article in 40 Harv. Law Rev. cited supra: "The operation of the Texan doctrine illustrates its inconvenience. It appears to be a regular course of business for a swindler to buy a motor car on credit in California or else-

where, drive it into Texas, and sell or pledge it there. The original seller is helpless in the face of this practice; and Texas will doubtless continue full of willing bona fide buyers. That this result is most unfortunate from the point of view of commercial practice is clear."

We are unable to see how the adoption of a rule of retaliation could in any way protect our citizens from any injury caused by the undesirable practices which are said to result from the operation of the Texas doctrine; nor are we convinced that the adoption of such a rule by this court would not merely further extend the evil by encouraging the unlawful removal into New Mexico of property which had been mortgaged. in Texas. Therefore, even assuming the law of Texas to be that an attaching creditor will be preferred as against a holder of a chattel mortgage recorded in the state where the mortgage was executed and the property located at the time of its execution, but not recorded within the state where the property was situated at the time of the attachment, we hold that the lien of a valid Texas mortgage will be preferred to that of a creditor who attaches the property in New Mexico after its removal into this state, without the knowledge or consent of the mortgagee.

The ruling of the trial court, in so far as it relates to the priority of the plaintiff's lien over that of intervener's mortgage lien upon the tractor will be reversed.

We come next to the ruling of the trial court that plaintiff's attachment lien is superior to the claim of the intervener in and to the Gold Digger plow covered by its conditional sale contract.

Appellant contends that the trial court erred in holding the conditional sale contract so defective as to description and location of the property purported to be covered thereby as to be wholly invalid as to attaching creditors. The argument is that conditional sales contracts are, under the Texas law, considered chattel mortgages, and that, under the decisions of the courts of that state, it is not necessary for the encumbered property to be so described in the instrument as to be capable of being identified by the written recital, but that the description is sufficient to put third parties on notice if the instrument suggests inquiries or means of identification which, if pursued, will disclose the property mortgaged. We are unable to see how this principle aids the description contained in the contract involved in the case at bar.

The only description of the property contained in the contract is "one ten foot Oliver Gold Digger One Way Plow." Such description does no more than identify the plow as one of a numerous class, without noting any mark or specification by which it may be differentiated from others in its class. Nor are there any other facts contained in the body of the instrument which give the means by which the plow covered can be definitely ascertained. The contract is signed "B. M. Golloday Implement Co., by B. M. Golloday, Hartley, Texas," and "W. B. Thompson, Dalhart, Texas." It does not recite that the plow

is in the possession of Thompson in Dalhart. One of the covenants of the contract provides: "The purchaser shall not remove said property out of the filing district where first kept for use by the purchaser." The contract was filed for record in Hartley county, Tex. The most that can be said is that the instrument suggests that the property may be found somewhere in Hartley county. Such inferential statement of the location of the property is too indefinite to bring the defective description within the aiding principle that "a description which, without stating the location of the property, would be regarded as too indefinite and uncertain, may be rendered sufficiently definite and certain by making the mortgage itself indicate where the property may be found on inquiry." Jones on Chattel Mortgages, § 54-a (5th Ed.). See and compare Iowa Automobile Supply Co. v. Tapley, 186 Iowa, 1341, 171 N. W. 710; First Nat. Bank of Hudson v. Maxwell, 198 Iowa, 813, 200 N. W. 401.

The ruling of the trial court as to the plow must therefore be affirmed, unless appellant is correct in its further contention that the trial court erred in finding that the sheriff "seized" it under plaintiff's writ of attachment on July 30th, and that he "kept it within his custody" within the meaning of the New Mexico Statutes, § 105-1612, 1929 Compilation.

It appears from the record that on July 30th, before noon, the deputy sheriff, Pedersen, having a writ of attachment obtained by Hart, drove over with Hart to the Ray Lease, a farm near Pittsburg on which the defendant Thompson had formerly lived, and on which the plow and tractor and other property belonging to Thompson were located. Pedersen posted a copy of the writ on the door of a shack located on the farm, and then went out into the fields to locate and levy upon Thompson's property. He found one Bolton, whose relationship, if any, to the defendant Thompson does not clearly appear, in charge of things, explained his mission, and with Bolton's aid located various items of farm machinery belonging to Thompson scattered about the farm. Among these were the tractor, which weighed about five tons, and the Gold Digger plow. The aggregate weight of all the machinery levied on was over ten tons. Pedersen, after viewing each article, made a descriptive inventory of the property found, told Bolton that he was levying upon it, appointed Bolton caretaker of it, and took from him a signed receipt therefor. At the same time, he told Bolton that he (Bolton) would be responsible to the sheriff for the property listed, and that, if any one attempted to interfere with it and he could not stop them, he should notify the sheriff. Bolton appears to have accepted this custodianship. It further appears that Bolton lived on the Ray Lease at the time of the levy, that he was in charge thereof at the time, and, according to his own testimony, has continued in charge ever since. Some time about the middle of August Bolton went to Dalhart, Tex., on business, leaving things in charge of his farmhand, one Cornstubble. During his two day absence from the farm, Lowe, the intervener's

agent, went to the place where the machinery was located, and, acting under the provisions of intervener's chattel mortgage, took possession of the tractor and plow and removed them to a neighboring farm. When Bolton returned from Dalhart and learned what had happened, he immediately notified Pedersen, and, with Pedersen, went to the farm to which the chattels had been removed and repossessed them and brought them back to the Ray Lease, or Thompson place, as it was sometimes called. Shortly thereafter the sheriff filed a return of the levy made on July 30th. In November Bolton went to Clayton on business. The length of his absence on this occasion does not appear. Again, about a month before the trial of the case on February 19th, he went to Dalhart to do some work, and, it appears, he was still working there at the time of the trial. He testified, however, that during the periods when he was away at Dalhart and Clayton he made two special trips back to the farm to see about the machinery of which he was caretaker. About two weeks prior to the trial, the sheriff appointed one Ralph Jett custodian in place of Bolton, and the machinery was then removed to Jett's place in Pittsburg.

We think that the acts of the sheriff on July 30th were sufficient to constitute a valid constructive seizure of the property. It is not always essential to the validity of a levy that the attaching officer lay hands upon or remove the property attached, especially where, as here, the property is of such a cumbrous nature that its manipulation and removal would be attended with great expense or difficulty. The essential requirement is that the acts of the officer be such as to put the property out of the control of the attachment debtor. Nor is it essential to the keeping of the property in custodia legis that the sheriff maintain personal and immediate custody over it. He may do so indirectly, through his servant or through a custodian appointed by him and responsible to him. See Sinsheimer v. Whitely, 111 Cal. 378, 43 P. 1109, 52 Am. St. Rep. 192; Hamilton v. Hartinger, 96 Iowa, 7, 64 N. W. 592; Irilarry v. Byers, 84 Cal. App. 28, 257 P. 540; Higgins v. Drennan, 157 Mass. 384, 32 N. E. 354; Moore v. Brown et al., 107 Ga. 139, 32 S. E. 835; Battle Creek Valley Bank v. First National Bank of Madison, 62 Neb. 825, 88 N. W. 145, 56 L. R. A. 124; Wolf v. Taylor, 68 Tex. 660, 5 S. W. 855, at page 856; Fleming v. Moore, 213 Ala. 592, 105 So. 679; Waples on Attachment and Garnishment, pages 175, 176.

The further contention is made, however, that even if a valid attachment lien was created by the constructive seizure and appointment of a custodian on July 30th, the lien of the attachment was subsequently lost by the failure of the sheriff, either himself or through his appointed custodian, Bolton, to keep it within his custody. This contention we think to be without merit. There is no evidence whatsoever that Bolton ever abandoned his trust, or that he did not, during his temporary absences from the premises where the property was situated, leave some one to look after it. And "the law does not favor

280

abandonment or forfeiture of an attachment." Landers v. Moore, 214 Ala. 20, 106 So. 225.

On this branch of the case, therefore, we hold that there was no error committed by the trial court.

The judgment of the court will be reversed in so far as it relates to the relative claims of the plaintiff and intervener in and to the Hart-Parr tractor covered by intervener's mortgage, and in all other respects it will be affirmed. It is so ordered.

WATSON, C. J., and BICKLEY and SADLER, JJ., concur.

ZINN, J., did not participate.